**In re OLSTEN CORP. SECURITIES LITIG.**

No. 97–CV–1946 (DRH).

United States District Court,
E.D. New York.

May 4, 1998.

Michael Spencer, William Fredericks, Milberg Weiss Bershad Hynes & Lerach, New York City, for plaintiff Weichman.

Fred Isquith, Wolf Haldelstein Adler Freeman & Herz, New York City, for plaintiff Goldman.

Robert Harwood, Wechsler Harwood Halebian & Feffer, New York City, Nadeem Faruqi, Faruqi & Faruqi, New York City, for plaintiff Waldman.

I. Stephen Rabin, Rabin & Peckel, New York City, for plaintiff Cannold.

Robert Alessi, Cahill Gordon & Reindel, New York City, for defendant Olsten.

## ORDER

BOYLE, United States Magistrate Judge.

The present motions involve issues of consolidation and appointment of lead plaintiff and lead counsel with regard to four separate actions—*Weichman v. Olsten Corp., et al.* (97–CV–1946 (DRH)), *Goldman v. Olsten Corp., et al.* (97–CV–4501 (DRH)), *Waldman v. Olsten Corp., et al.* (97–CV–5056 (DRH)), and *Cannold v. Olsten Corp., et al.* (97–CV–5408 (DRH)). Pending before the court are the motions of plaintiffs Weichman, Goldman, Waldman and Cannold, as well as defendant Olsten. to consolidate, and the motions of Weichman, Goldman and Waldman for appointment of lead plaintiff and lead counsel in any consolidated actions. For the reasons stated below, the four actions are hereby consolidated, the Waldman Plaintiffs Group is appointed lead plaintiff for the consolidated action, and the law firms of Wechsler Harwood Halebian & Feffer and Faruqi & Faruqi are approved as co-lead counsel.

## I. BACKGROUND

The four within actions involve claims that are brought under the Securities Exchange Act of 1934 against defendant Olsten Corporation ("Olsten"), as well as against several officers and directors of Olsten. The plaintiffs in the four actions are individuals who purchased Olsten common stock during the class periods as set forth in their complaints. The defendant Olsten is a Delaware Corporation with its principal executive offices in Melville, New York. *See Weichman Cplt* ¶ 11(a). Olsten provides home health care and related services, as well as staffing services to business, industry and government, *see id.,* and is the largest provider of home healthcare and staffing services in North America. *See Waldman Cplt.* ¶ 25.

### A. The Weichman Action

Plaintiff Gail Weichman filed an action against Olsten Corporation, Miriam Olsten, William Olsten, Anthony J. Puglisi and Frank Ligouri on April 17, 1997 ("Weichman Action"). This is the earliest filing of the four actions. before the court. On June 26, 1997, Judge Hurley appointed Weichman as lead plaintiff, and the Milberg Weiss Bershad Hynes & Lerach ("Milberg Weiss") and Schiffrin & Craig firms were approved as lead counsel under the Private Securities Lit-

igation Reform Act of 1995 ("PSLRA"). *See Order of the Hon. Denis R. Hurley*, dated June 26, 1997.

The Weichman Action asserts violations of federal securities law on behalf of the purchasers of Olsten common stock issued during the period from May 31, 1996 through November 21, 1996 under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder. *Weichman Cplt.* ¶¶ 1, 68, 77, 82, 92. On June 1, 1996, plaintiff Weichman received 116 Olsten shares in exchange for 200 shares of Quantum Health Resources, Inc., which she held prior to the merger of the two companies. On September 4, 1996, plaintiff Gail Weichman purchased .2796 shares of Olsten Corporation. Plaintiff alleges that the value of Olsten shares has declined substantially as a result of the defendants violations. *See id.* at ¶ 65.

Weichman alleges that on November 21, 1996, Olsten announced for the first time that it was "the victim of ongoing margin pressures in its home healthcare business, staffing business and Medicare business which had eroded its earnings and income." *Id.* at ¶ 2. Weichman asserts that "the very margin pressures that [Olsten] publicly revealed for the first time on November 21, 1996 had been in existence and severely negatively impacting Olsten's business at all prior times during the class period." *Id.*

The Weichman complaint asserts that the defendants failed to disclose problems with the contract between Olsten and CIGNA Healthcare ("CIGNA"), pursuant to which Olsten was to provide home healthcare to CIGNA members. *Id.* at ¶ 5. Specifically, Weichman claims that Olsten's bid for the CIGNA contract was extremely low and that Olsten "was required to invest certain upfront costs to develop the infrastructure necessary to perform under the CIGNA contract." *Id.* As a result, Weichman alleges that "by the first day of the Class Period, defendants knew, or recklessly disregarded," the fact that "the CIGNA contract would materially negatively impact [Olsten's] revenues, earnings and income for the foreseeable future." *Id.* Weichman alleges that the

CIGNA contract and its implementation eroded the Company's margins and caused the Company to expend capital, which decreased earnings and income. *Id.* at 49.

Weichman also argues that in the stock for stock merger agreement with Quantum Health Resources, Inc. ("Quantum"), the defendant misrepresented the business, operations, and financial condition of Olsten, by failing to disclose in the agreement Olsten's problems with CIGNA, and the margin pressures that it faced. *Id.* at ¶ 31.

Weichman further asserts claims regarding an undisclosed Medicare audit. Weichman alleges that Olsten's Form 10–K, for the period ending December 31, 1995, as well as its Form 10–Q, for the periods ending June 30, 1996 and September 29, 1996, failed to disclose the medicare audit. *Id.* at ¶¶ 35, 39, 41. Weichman argues that "[e]ven though Olsten had been notified by the federal government that it would be subjected to a Medicare audit for the years 1994 and 1995, ... defendants failed to disclose the impending audit, and instead publicly issued a Prospectus that falsely represented that [Olsten] (1) was not the subject of any pending or threatened governmental investigation or proceeding, and (2) was, to [Olsten's] knowledge, in compliance in all material respects with all laws, regulations and governmental payor and/or program requirements." *See Weichman Brief in Supp. Mot. to Consol.*, at 6; *see also Weichman Cplt.* ¶¶ 32, 33. Moreover, while Olsten disclosed that it "would be taking an after-tax charge to its earnings of up to $45 million to cover merger, integration and related costs resulting from the Quantum acquisition and 'certain allowances related to Olsten's home healthcare business,'" it did not disclose that $18 million of the $45 million charge related to an assessment arising from the Medicare audit. *Weichman Cplt.* ¶ 38.

Weichman also claims that the individual defendants engaged in insider trading "by issuing false favorable statements about the Company's business ... without disclosing the material adverse facts about [Olsten] to which they were privy." *Id.* at ¶ 53. Weichman alleges that the defendants engaged in a scheme in order to protect their executive

positions, to enhance the value of their personal Olsten securities, and to maintain the inflated price of Olsten common stock to use it as currency for the merger between Olsten and Quantum. *Id.* at ¶ 52. Weichman also asserts that Miriam and William Olsten reaped proceeds in excess of $10.25 million. In sum, Weichman alleges that "[d]efendants' materially false and misleading statements during the Class period resulted in plaintiff and other members of the Class purchasing the Company's common stock at an artificially inflated price...." *Id.* at ¶ 50.

### B. *The Goldman Action*[1]

On August 5, 1997, plaintiff Esta Goldman, as co-trustee for the trust established by the will of Irwin Goldman, filed an action against Olsten Corporation, Miriam Olsten, William Olsten, Frank Liguori, and Anthony Puglisi ("Goldman Action"). The Goldman Action asserts that defendants violated of Sections 10(b) and 20 of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, on behalf of all persons and entities who purchased Olsten Common Stock between March 6, 1996 and July 16, 1997. *Goldman Cplt.* ¶ 17. Goldman purchased 300 shares of Olsten common stock on July 23, 1996, at $28 1/2 per share, and 100 shares of Olsten common stock on September 18, 1996, at $22 per share. Goldman alleges that as a result of Olsten's fraudulent practices, Olsten's common stock, which closed on July 16, 1997, at $21 5/8 per share, fell to $20 5/8 per share on July 17, 1997, and continued to fall to $17 13/16 on July 30, 1997. *Id.* at 55.

Goldman alleges that the defendants deceived the investing public "concerning Olsten's operations and controls, and the fact that significant and material portions of its income were derived [from] ... improper preparation and filing of materially inaccurate and inflated cost reports for reimbursement by Medicare and the improper structuring of transactions with healthcare providers to increase the amount of expenses reimbursable by the government." *Id.* at ¶ 6. Goldman alleges that Olsten's Form 10–K, for the period ending December 31, 1995, as well as its Form 10–Q, for

the periods ending June 30, 1996 and September 29, 1996, failed to disclose material facts regarding Medicare fraud and improper Medicare reimbursement. *Id.* at ¶¶ 27,-28,29,33,34.

Specifically, Goldman alleges that Quantum—the company that Olsten acquired—was engaged in an ongoing fraudulent practice of providing inducements and gifts to its patients, relatives and physicians to accept more product than required. *Id.* at ¶ 31. Goldman states that "[n]ot only did defendants know about, and fail to disclose, the pervasiveness of these fraudulent practices at Quantum but they allowed them to continue unabated and left plaintiff, Class members and the investing public in the dark as to these practices." *Id.* at ¶ 32.

Goldman also alleges that Olsten was engaged in undisclosed fraudulent practices regarding Columbia/HCA Healthcare Corporation, a company managed by an Olsten subsidiary, for shifting non-reimbursable hospital expenses to reimbursable home care expenditures. *Id.* at ¶¶ 53–54.

With regard to the scienter allegations, Goldman claims that the defendants (1) artificially inflated the market price of Olsten common stock during the Class Period, and (2) caused plaintiff and other members of the class to purchase Olsten common stock at inflated prices. *Id.* at ¶ 6. In addition, Goldman argues that the individual defendants generated huge insider trading profits—in excess of $10.25 million—during the Class period. *Id.* at ¶ 57.

### C. *The Waldman Action*

Plaintiff Elliott Waldman, as trustee for the Elliott Waldman Pension Trust, filed an action against Olsten Corporation, Frank Liguori, Miriam Olsten, William Olsten, Stuart Olsten and Anthony Puglisi on August 29, 1997 ("Waldman Action"). The Waldman Action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, on behalf of a class of persons and entities who purchased Olsten stock between March 6, 1996 and August 25, 1997. *Wald-*

---

1. The allegations set forth in the Waldman, Gold-   man, and Canold actions are virtually identical.

*man Cplt.* ¶¶ 5, 16. On March 25, 1996, plaintiff Waldman purchased 500 shares of Olsten common stock at $32 3/8 per share. Waldman alleges that as a result of Olsten's fraudulent practices, Olsten's common stock, which closed on July 16, 1997, at $21 5/8 per share, fell to $20 5/8 per share on July 17, 1997, and continued to fall to $17 13/16 on July 30, 1997. *Id.* at ¶ 55.

Waldman claims that the defendants "failed to disclose that significant and material portions of its income were derived by engaging in a course of business operations based on the filing of materially inaccurate and inflated Medicare cost reports, the wrongful provision of inducements of gifts to patients, relatives and their physicians to accept more product than required, and the improper structuring of transactions from as early as 1994 with healthcare providers ... to improperly increase the expenses reimbursable by the government." *Id.* at ¶ 28. Waldman alleges that Olsten's Form 10–K, for the period ending December 31, 1995, as well as its Form 10–Q, for the periods ending June 30, 1996 and September 29, 1996, failed to disclose material facts regarding Medicare fraud and improper Medicare reimbursement. *Id.* at ¶¶ 27, 28, 29, 33, 34.

Waldman also alleges that Quantum—the company that Olsten acquired—was engaged in fraudulent practices, and that "[d]efendants knew or should have known of the pervasiveness of these fraudulent practices at Quantum but they allowed them to continue unabated and left plaintiff, Class members and the investing public in the dark as to these practices." *Id.* at ¶¶ 31, 32.

In addition, Waldman alleges that Olsten was engaged in undisclosed fraudulent practices regarding Columbia/HCA Healthcare Corporation, a company managed by an Olsten subsidiary, for shifting non-reimbursable hospital expenses to reimbursable home care expenditures. *Id.* at ¶¶ 53–54.

Waldman further claims that the defendants engaged in a scheme of insider selling "in order to (i) protect and enhance their executive positions; and (ii) enhance the value of their personal Olsten securities and allow for profitable insider sales yielding proceeds in excess of $10.25 million, generating huge insider trading profits during the Class period." *Id.* at ¶ 61.

Based upon the above-referenced non-disclosures and/or misrepresentations, Waldman asserts that the market price of Olsten common stock was artificially inflated, thereby damaging the members of the Waldman class. *Id.* at ¶¶ 39, 40.

### D. *The Cannold Action*

On September 19, 1997, plaintiff Cannold filed an action against Olsten, Frank Liguori, Miriam Olsten, Stuart Olsten and Anthony Puglisi, on behalf of all persons who purchased Olsten Common stock during the period March 6, 1996 through July 16, 1997 ("Cannold Action"). *Cannold Cplt.* ¶ 1. Plaintiff Cannold asserts that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder. On September 30, 1996, Cannold purchased 500 shares at $24 per share. Cannold alleges that as a result of Olsten's fraudulent practices, Olsten's common stock, which closed on July 16, 1997, at $21 5/8 per share, fell to $20 5/8 per share on July 17, 1997, and continued to fall to $17 13/16 on July 30, 1997. Id. at ¶ 52.

Cannold alleges that "defendants knowingly or recklessly made materially false and misleading statements concerning Olsten's operations and financial results when [Olsten] improperly prepared and filed materially inflated cost reports for Medicare reimbursement and when it structured transactions with healthcare providers to improperly increase Medicare reimbursements." *Id.* at ¶ 2. Cannold alleges that Olsten's Form 10–K, for the period ending December 31, 1995, as well as its Form 10–Q, for the periods ending June 30, 1996 and September 29, 1996, failed to disclose material facts regarding Medicare fraud and improper Medicare reimbursement. Id. at ¶¶ 27, 29, 3 1, 32, 33, 34. Cannold also alleges that the defendants knew of and failed to disclose Quantum's fraudulent practice of providing gifts and inducements to patients, relatives, and physicians to accept more product than required. *Id.* at ¶¶ 29,-30.

As for the allegations regarding scienter, Cannold claims that Miriam Olsten realized over $11.75 million in insider trading profits. Cannold alleges that "[a]s a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class period." *Id.* at ¶ 61.

## II. *MOTION TO CONSOLIDATE*

### A. *The Parties' Positions*

All of the plaintiffs—Weichman, Goldman, Waldman and Cannold, as well as the defendant Olsten—agree that some form of consolidation is appropriate. What is disputed is exactly which actions should be consolidated.

### 1. *Plaintiffs Weichman and Goldman— and Defendant Olsten—Support Consolidation of All Four Actions*

Plaintiff Weichman argues that the Goldman, Waldman, and Cannold actions should be consolidated into the Weichman action for all purposes. Weichman argues that (1) the four actions involve common questions of law and fact; and (2) there are no differences between the actions which render consolidation impractical or inappropriate. *See Weichman Brief in Supp. of Mot. to Consol.,* at 11–15.

The Goldman plaintiffs favor consolidating all four actions. Goldman argues that the four actions should be consolidated, as "[a]ll four complaints allege a course of conduct which inflated the price of Olsten stock and harmed purchasers of its stock. Significantly, the class allegations in all four complaints contain most of the same persons and purchase transactions." *See Goldman Brief in Supp. of Mot. to Consol.,* at 3. Goldman also contends that the interests of judicial economy will be furthered by consolidating the four cases. *See id.* As indicated by the Goldman plaintiffs, all of the purchasers of stock alleged to be injured in Weichman are also alleged to have been injured by related non-disclosures which form the basis of the Goldman, Cannold, and Waldman Actions. *See Goldman Mem. in Supp. of Mot. to Consol.* In fact, "probably more than half of

the class consists of persons whose transactions in the security would qualify them to be members of each of the alleged classes." *Id.*

Defendant Olsten supports the consolidation of the four actions "because they allege similar facts, raise common legal issues and arise from the same transactions and events." *See Olsten Mem. in Supp. of Mot. to Consol.,* at 3. Olsten also submits that consolidation is favored in order to promote the interests of judicial economy.

### 2. *Waldman and Cannold Support Consolidation of the Waldman, Cannold and Goldman Actions*

Waldman's primary position is that the court should consolidate the Waldman Action with the Goldman and Cannold Actions. Alternatively, Waldman requests that in the event that the court consolidates all actions, the Waldman Plaintiffs Group be designated Lead Plaintiff of the consolidated action.

Waldman argues that the Waldman, Cannold and Goldman actions assert similar claims which are based on Medicare and Medicaid fraud. *See Waldman Mem. in Opp. to Weichman Mot. to Consol.,* at 3. Waldman argues that the Weichman Action—by contrast—"concerns problems relating to ongoing margin pressures in the Company's home healthcare, staffing, and medicare businesses which allegedly eroded its earning and business." *Waldman Mem. in Supp. of Waldman Mot. to Consol.,* at 3. Waldman further claims that the Weichman Action asserts a different cause of action, as it "is essentially a failure to meet earnings projections case." *Waldman Mem. in Opp. to Weichman Mot. to Consol.,* at 4.

Waldman also claims that the Weichman and Waldman Actions should not be consolidated because the interests of the two groups of plaintiffs conflict. *Id.* at 5. Waldman states that Weichman was a holder of Quantum shares prior to the Olsten–Quantum merger and obtained her 116 Olsten shares in exchange for her 200 Quantum shares. Waldman argues that "former shareholders of Quantum Health Resources, Inc. (whom Weichman now represents as lead plaintiff [of that action]) appear to have actually benefitted from fraud committed against the

shareholders of Olsten Corporation (whom Waldman seeks to represent). As a consequence, Weichman's suitability as a class representative is open to attack were she to attempt to prosecute Waldman's fraud claims." *See Letter from Robert I. Harwood. Esq. to the Hon. E. Thomas Boyle,* dated Nov. 12, 1997.

While Waldman primarily opposes consolidating the four actions, Waldman maintains that "it may be appropriate, in the interests of judicial economy, to coordinate (as opposed to consolidate) the Weichman Action with Waldman and related actions." *See Aff. of Robert Harwood,* at ¶ 11, dated Oct. 22, 1997.

Plaintiff Cannold also argues that consolidation with respect to all four actions is inappropriate, as the four actions do not contain common issues of law and fact. Rather, Cannold argues that the Cannold, Waldman and Goldman actions should be consolidated. In support of its argument, Cannold claims that Weichman seeks to "require the plaintiffs in the Medicare Fraud Actions to assert claims based on facts that neither they nor plaintiff Weichman for that matter had knowledge of at the time the Weichman action was commenced." *See Cannold Mem. Law in Opp. to Motions to Consol. the Four Actions,* at 4.

## B. *Discussion*

### 1. *The Applicable Standard*

Rule 42(a) of the Federal Rules of Civil Procedure provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary cost or delay.

*See* Fed.R.Civ.P. 42(a).

The decision to consolidate for trial lies within the discretion of the trial judge. In determining whether consolidation is appropriate, the court must consider whether "judicial economy favor[s] consolidation." *Johnson v. Celotex Corp.,* 899 F.2d 1281,

1285 (2d Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). This consideration, however, "must yield to a paramount concern for a fair and impartial trial." *Id.* The applicable standard has been stated as follows:

whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Johnson,* 899 F.2d at 1285 (quoting *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1495 (11th Cir.1985)). The burden is on the party moving for consolidation to show "the commonality of factual and legal issues in different actions." *See In re Repetitive Stress Injury Litig.,* 11 F.3d 368, 374 (2d Cir.1993).

Moreover, "[i]n securities actions where the complaints are based on the same 'public statements and reports' consolidation is appropriate if there are common questions of law and fact and the defendants will not be prejudiced." *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1211 (S.D.N.Y.1992) (quoting *Lloyd v. Industrial Bio–Test Laboratories, Inc.,* 454 F.Supp. 807, 812 (S.D.N.Y.1978)). Consolidation is generally ordered "so long as any confusion or prejudice does not outweigh efficiency concerns." *Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 129 (S.D.N.Y. June 9, 1997).

### 2. *Consolidation of the Four Actions*

The court finds that consolidation of the four actions is appropriate. Each complaint involves claims asserted under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. More importantly, each action alleges that Olsten concealed information regarding its business practices, which involved Medicare billing. Essentially, all four actions can be characterized as failure to disclose to shareholders actions—whether

the allegations of failure to disclose are based upon a medicare audit or medicare fraud. Weichman asserts claims with regard to Olsten's failure to disclose (1) costs involved in its contract with CIGNA, (2) various facts in its merger agreement with Quantum and (3) a Medicare audit. *See Weichman Cplt.* The basis of the Goldman, Waldman and Cannold Actions is a failure to disclose material facts with regard to Medicare fraud—involving Quantum and Olsten—and improper Medicare reimbursement practices. *See Goldman Cplt.* ¶¶ 6, 27, 28, 29, 32, 53–54; *Waldman Cplt.* ¶¶ 28, 31, 32, 53–54; *Cannold Cplt.* ¶¶ 2, 27, 29, 31, 32. Even though the facts in the Weichman Action involve a Medicare audit and the facts in the Waldman, Goldman and Cannold Actions involve Medicare fraud, such a difference does not prevent consolidation since the underlying facts will be the same. Moreover, the facts and legal issues need not be identical to warrant consolidation. *See Werner,* 797 F.Supp. at 1211 (finding that consolidation was appropriate even though not all facts in original case applied to the defendants in second case); *Lloyd,* 454 F.Supp. at 812 (consolidating cases and characterizing legal and factual issues as identical, even though one action involved common stock and other action involved options, and not all of the individual defendants named in one action were named in other).

Although the class period in Weichman begins before and ends during the class periods alleged in the other three actions, the allegations in the later three actions are based upon disclosures that concern facts common to all four actions. *See Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at * 7 (N.D.Ill. Aug.11, 1997) ("The varying class periods can nevertheless be harmonized because all of the complaints are based on a common set of operative facts."). As a factual basis for each action, the plaintiffs in the four complaints rely upon the same series of allegedly false and misleading public statements and omissions. *See Werner,* 797 F.Supp. at 1211. All of the actions allege that Olsten's Form 10–K, for the year ending December 31, 1995, materially misrepresented Olsten's managed care business. Moreover, all of the actions claim that statements in Olsten's Form 10–Q, for the period

ending June 30, 1996 and Olsten's Form 10–Q for the period ending September 29, 1996, further provide a factual basis for the material misrepresentations and omissions alleged in the four within actions. *Compare Weichman Cplt.* ¶¶ 39, 40, *with Goldman Cplt.* ¶¶ 33, 34; *Waldman Cplt.* 33, 34; and *Cannold Cplt.* ¶¶ 31, 32. Whether characterized as an action based upon a failure to disclose the upcoming Medicare audit, *see Weichman Cplt.* ¶¶ 34–35, or as an action based upon a failure to disclose improper Medicare billing practices, *see Goldman Cplt.* ¶¶ 27–29; *Waldman Cplt.* ¶¶ 27–29; *Cannold Cplt* . ¶¶ 26–27, the statements in Olsten's 10–K and 10–Q raise common questions of law and fact. Such common questions include whether the defendants violated federal securities laws and whether the defendants' statements to the investing public misrepresented or omitted to state material facts about the business, operations and compliance of Olsten. *See In re Hallwood Energy Partners, L.P. Sec. Litig.,* 1993 WL 378461, at * 2 (S.D.N.Y. Sept.22, 1993) (ordering consolidation where "both actions are grounded on the same public filings and the same alleged material misrepresentations and omissions, . . . identical injuries are alleged arising out of a single scheme and common course of conduct, . . . . and both actions involve related violations of the federal securities laws").

In addition, all actions rely upon Olsten's Report Form 8–K, filed on November 21, 1996, which explained that the "ongoing margin pressures affecting its two primary businesses—staffing services and home health care services—and reduced revenues from medicare operations" would result in lower than expected net income. *See Weichman Cplt* ¶ 42; *Goldman Cplt.* ¶ 35; *Waldman Cplt.* ¶ 35; *Cannold Cplt.* ¶ 33. While the Weichman Action alleges that the CIGNA contract, Olsten's focus on national staffing contracts and the decrease in Medicare business were responsible for Olsten's earnings shortfall and narrowed margins, *see Weichman Cplt.* ¶ 45, and the Goldman, Waldman, and Cannold Actions focus on Quantum's fraudulent billing practices, *see Goldman Cplt.* ¶ 36; *Waldman Cplt.* ¶ 36; *Cannold*

*Cplt.* ¶ 34, all actions allege misrepresentations and omissions regarding the Form 8–K.

Furthermore, the allegations of scienter are virtually identical in each of the four cases. All four actions allege that the individual defendants engaged in a scheme to inflate Olsten stock and profited from such scheme. *See Weichman Cplt.* ¶¶ 51–53; *Goldman Cplt.* ¶¶ 56–58; *Waldman Cplt.* ¶¶ 60–62; *Cannold Cplt.* ¶ 53. Accordingly, "[t]he resolution in one litigation of such common questions, relating to the existence, character and materiality of defendants' alleged misrepresentations is both a logical and appropriate way to proceed." *See Waldman v. Electrospace Corp.,* 68 F.R.D. 281, 286 (S.D.N.Y.1975).

The court's conclusion is further reinforced by the fact that defendants favor consolidation and do not claim that they will be prejudiced by the consolidation of all four actions. Moreover, "[i]t is well recognized that consolidation of stockholders' suits often benefits both the courts and the parties by expediting pretrial proceedings, avoiding duplication of discovery, and minimizing costs." *Waldman,* 68 F.R.D. at 283. In addition, "[t]he resolution in one litigation of such common questions, relating to the existence, character and materiality of defendants' alleged misrepresentation is both a logical and appropriate way in which to proceed." *Id.* at 286. Here, defendant Olsten has affirmatively moved for consolidation of all four actions. By consolidating all four actions, defendant Olsten—as well as the plaintiffs—will be able to avoid duplicative discovery, and minimize their expenses. Therefore, in the interests of judicial economy and efficiency, the court grants the motions of plaintiffs Weichman and Goldman to consolidate all four actions herein.

Lastly, it should be noted that if the discovery process uncovers evidence that the actions should not be consolidated for trial purposes, this decision to consolidate does not preclude the plaintiffs from making a motion for severance prior to trial.

### III. *APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL*

This motion for appointment of lead plaintiff and approval of lead counsel arises under the provisions Private Securities Litigation Reform Act of 1995 ("PSLRA"), which amended the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4(a). The PSLRA, according to its legislative history, was enacted in response to perceived abuses of the class action procedure. *See Fischler v. AmSouth Bancorporation,* 1997 WL 118429, at * 1 (citing H.R.Rep. No. 104–369 (1995), reprinted in 1996 U.S.C.C.A.N. 730). Congress was concerned with the plaintiffs' lawyers' "race to the courthouse," the outcome of which was determinative of the lead plaintiff. *See* S.Rep. No. 104–98 (1995), reprinted in 1996 U.S.C.C.A.N. 679 ("Courts traditionally appoint lead plaintiff and lead counsel in class action lawsuits on a first come, first serve basis.... The Committee believes that the selection of the lead plaintiff should rest on considerations other than a speedy filing of the complaint"). By enacting the PSLRA, Congress intended to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R .Rep. No. 104–369.

With respect to the appointment of lead plaintiff, the PSLRA requires that the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members." *See* 15 U.S.C. § 78u–1(a)(3)(B)(i). In making this determination, the court is guided by the "rebuttable presumption ... that the most adequate plaintiff ... is the person or group of persons that— (aa) has either filed the complaint or made a motion in response to a notice [that is published no later than twenty days after the complaint is filed] ...; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u–1(a)(3)(B)(iii)(I). The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most

adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *See* 15 U.S.C. § 78u–1(a)(3)(B)(iii)(II).

As for the selection of lead counsel, the PSLRA states that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

### A. *Lead Plaintiff*

#### 1. *Timely Filed Motion*

It is undisputed that Weichman, Waldman and Cannold each timely provided notice, within 20 days of the filing of the complaint identifying the claims alleged in each action and the class period, and informed potential class members that, within 60 days, they may move to serve as the lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(A)(i); 15 U.S.C. § 78u–4(a)(3)(B)(i). By filing the complaint and moving to serve as lead plaintiff within 60 days, the three movants have satisfied the first requirement for determining the "most adequate plaintiff." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This provision, therefore, does not assist the court in making its determination of whom should be appointed lead plaintiff for the consolidated class.

#### 2. *Largest Financial Interest In Relief*

The second requirement is that plaintiff or plaintiffs must be the "person or group of persons" that have the largest financial interest. The language of the statute, "person or group of persons" indicates that a plaintiffs group—not merely the individual plaintiff—is considered. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I); *see also Gluck v. Cellstar Corp.*, 976 F.Supp. 542, 546 (N.D.Tex.1997) (finding that aggregating the shares of several plaintiffs for the purposes of this calculation is proper under the statutory language).

■ While the PSLRA does not explain how a court should determine the largest financial interest, one court has recognized four factors: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period. *See Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D.Ill. Aug.11, 1997).

■ Although the statute mandates that the lead plaintiff has the "largest financial interest," only the Waldman Plaintiff's Group and Cannold—not Weichman—argue that they satisfy this requirement. Weichman, while she moves to be appointed as lead plaintiff of the consolidated action, offers no information with respect to the magnitude of her financial interest, other than stating that she obtained her 116 Olsten shares in exchange for her 200 Quantum shares. Even though Cannold argues that he has the largest financial interest in the outcome of the litigation, he does not present any facts to support this assertion. *See Mem. of Law in Supp. of Cannold Mot. to be Appointed Lead Plaintiff,* at 5–6.

By contrast, Waldman states that the Waldman Plaintiffs Group "has the strongest financial interest of any putative lead plaintiff in the outcome of this action based upon the substantial damages incurred as a result of its ownership of" 11,700 shares of Olsten common stock during the Class Period. *See Mem. of Law in Supp. of Appointment of the Waldman Plaintiff's Group as Lead Plaintiff,* at 7; *Mem. of Law in Opp. to Weichman Mot. to Consol.,* at 1.

I find that the Waldman Plaintiffs Group, as a result of its ownership of 11,700 shares of Olsten common stock during the class period, has the largest financial interest.

#### 3. *The Waldman Plaintiffs Group Satisfies the Requirements of Rule 23*

Rule 23(a) of the Federal Rules of Civil Procedure states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defens-

es of the class, and (4) the representative parties fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

At this stage in the litigation, the party moving for lead plaintiff of the consolidated action need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23. *See Gluck,* 976 F.Supp. at 542; *Fischler,* 1997 WL 118429, at *2 ("A wide ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is, typicality and adequacy."). Because Weichman and Cannold did not sufficiently show that either plaintiff has the largest financial interest in the outcome of the litigation, the court need only consider whether the Waldman Plaintiffs Group meets the typicality and adequacy standard of Rule 23.

A claim will meet the typicality requirement if "each class member's claim arises from the same course of conduct, and each class member makes similar legal arguments to prove the defendants' liability." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992). In addition, even if minor distinctions exist, the typicality requirement will be met. *See Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 151 (E.D.N.Y.1996). The Waldman Plaintiffs Group has sufficiently shown that its claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory, discussed *supra* with regard to consolidation." *See Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440, 445 (E.D.N.Y.1995) (citations omitted). Accordingly, the Waldman Plaintiffs Group share claims that are typical of the members of the class.

The adequacy requirement will be satisfied where (1) class counsel is "qualified, experienced and generally able to conduct the litigation;" (2) the class members do not "have interests that are antagonistic to one another," *In re Drexel,* 960 F.2d at 291 (citations and quotations omitted); and (3) the class

has "sufficient interest in the outcome of the case to ensure vigorous adequacy." *Lax,* 1997 WL 461036, at *6 (citing *Gammon v. GC Serv. Ltd. Partnership,* 162 F.R.D. 313, 317 (N.D.Ill.1995)).

The Waldman Plaintiffs Group satisfies the adequacy requirement. The Waldman Plaintiffs Group has a significant interest in the outcome of the litigation and its counsel is well qualified to pursue the litigation. Since antagonistic interests within the consolidated class could preclude a finding of adequacy here, it is somewhat ironic that Waldman argued with regard to consolidation that the interests of the Weichman class and the Waldman class are in conflict. As noted *supra* at II.A.2, Waldman claims that since Weichman acquired its interest in Olsten as a result of the merger with Quantum, Weichman—as a former Quantum shareholder—may have benefited from the inflated price of the Quantum stock at the time of the merger in June 1996. Weichman correctly notes, however, that this argument generally relates to the measure of damages and is otherwise insufficient to defeat consolidation. *See Weichman Brief in Supp. of Mot. to Consol.,* at 17–18; *Weichman Reply Brief,* at 5–7. *See also Blackie v. Barrack,* 524 F.2d 891, 909–910 (9th Cir.1975) (stating that the conflict must be "apparent, imminent and on an issue at the very heart of the suit" to preclude appointment). As Weichman noted, "regardless of the level of inflation in Quantum's stock, *all* plaintiffs will have an overriding common interest in showing the maximum extent of inflation in Olsten stock at every point . . . ." *Weichman Reply Brief,* at 7 (emphasis in original). The court finds that this alleged conflict is speculative and hypothetical, and should not prevent the appointment of the Waldman Plaintiffs Group as lead plaintiff. *See Gluck,* 976 F.Supp. at 547 (finding that "speculative assertions are insufficient" to demonstrate inadequacy). Accordingly, at this time there are no antagonistic interests within the consolidated class and the Waldman Plaintiffs Group satisfies the adequacy requirement.

### 4. Presumption Has Not Been Rebutted

The final issue is whether any party has shown that the Waldman Plaintiff's Group

"will not fairly and adequately represent the interests of the class," i.e. that the most adequate plaintiff "is subject to unique defenses." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa). Weichman asserts that the court should not disturb the already established leadership and that it was the first to file a complaint. Weichman argues that "there is no justification for disturbing Judge Hurley's existing order appointing plaintiff Weichman as Lead Plaintiff and approving her choice of lead counsel." *See Weichman Mem. in Supp. of Mot. to Consol.,* at 16. Weichman further claims that "the practical consequence of allowing Cannold or Waldman to relitigate case leadership issues would be to encourage potential plaintiffs or their counsel to sit back and await additional developments against defendant corporations, knowing that the ability to plead a slightly different variation of an earlier filed complaint would give them the potential opportunity to carve out their own satellite litigation which they could control." *Id.* at 16–17. Goldman similarly argues that the court should not revisit the issue of the appointment of Weichman as lead plaintiff. Cannold supports the appointment of the Waldman Plaintiffs Group as lead plaintiff of the consolidated action, *see Cannold Mem. in Opp. to Mot. to Consol.,* at 6, although Cannold also requests his own appointment as lead plaintiff, *see Mem. of Law in Supp. of Cannold Mot. to be Appointed Lead Plaintiff,* at 8–10.

Weichman premises its motion to be appointed as lead plaintiff on the "first to file" practice which existed prior to the PSLRA. While the court certainly recognizes that the lead plaintiff should be appointed as soon as practicable, the PSLRA provisions were designed to address abuses arising from the race to the courthouse which existed prior to the statute. Moreover, Judge Hurley's order merely appointed Weichman lead plaintiff with respect to that class action. Thus, there is nothing inconsistent in the appointment of the Waldman Plaintiffs Group as lead plaintiff of the consolidated action. The designation of the Waldman Plaintiffs Group as lead plaintiff of the consolidated action will not undermine or supersede the designation made by Judge Hurley with respect to the Weichman class. *See Primavera Familienstiftung,* 173 F.R.D. at 130 ("Consolidation 'does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.' ") (quoting *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933)). The court hereby appoints the Waldman Plaintiffs Group as lead plaintiff in the consolidated securities fraud action.

## B. *Lead Counsel*

Pursuant to 15 U.S.C. § 78u–4(a)(3)(B)(v), the Waldman Plaintiffs Group has moved for the approval of Wechsler Harwood Halebian & Feffer and Faruqi & Faruqi as co-lead counsel. The court has reviewed the resumes of the two firms and approves the Waldman Plaintiffs Group's choice of counsel. Both firms appear to be well-qualified to represent the Waldman Plaintiffs Group in the consolidated securities fraud action.

## *CONCLUSION*

For the reasons stated above, the Waldman Plaintiffs Group is appointed lead plaintiff and Wechsler Harwood Halebian & Feffer and Faruqi & Faruqi are approved as co-lead counsel. Pursuant to the Stipulation and [Proposed] Order, signed by all parties and "so-ordered" by the undersigned on January 8, 1998, the Waldman Plaintiffs Group shall have twenty-one (21) days from the entry of this order in which to serve a consolidated amended complaint. *See Stipulation and [Proposed] Order,* dated January 8, 1998.

SO ORDERED.