Sidney GLUCK, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CELLSTAR CORPORATION, et al., Defendants.

Civil Action No. 3:96–CV–1353–R.

United States District Court, N.D. Texas, Dallas Division.

Aug. 19, 1997.

Roger Farrell Claxton, Kilgore & Kilgore, Dallas, TX, David J. Bershad, Melvyn I. Weiss, Steven G. Schulman, Salvatore J. Graziano, Milberg Weiss Bershad Hynes & Lerach, New York City, Lawrence G. Soicher, Law Office of Lawrence G. Soicher, New York City, for Sidney Gluck, John Dolcemaschio, James Miller, Nancy L. Miller.

William Andrew Brewer, III, Michael Joseph Collins, Jamil N. Alibhai, Bickel &

Brewer, Dallas, TX, Stephen J. Gugenheim, Rubin & Gugenheim, Dallas, TX, Jay W. Eisenhofer, Stuart M. Grant, Scott R. Haiber, Blank Rome Comisky & McCauley, Wilmington, DE, Cynthia A. Calder, Grant & Eisenhofer, Wilmington, DE, for State of Wisconsin Investment Bd.

Michael Joseph Collins, Bickel & Brewer, Dallas, TX, Jay W. Eisenhofer, Blank Rome Comisky & McCauley, Wilmington, DE, for Martin Katz, Norma I. Vittor, Mostafa Aboul–Fetouh, Ahmed Aboul–Fetouh, Enass Aboul–Fetouh.

Roger Farrell Claxton, Robert James Hill, Kilgore & Kilgore, Dallas, TX, Melvyn I. Weiss, Milberg Weiss Bershad Hynes & Lerach, New York City, for Elvia H. Goggin, R. Heath Larry.

Roger Farrell Claxton, Robert James Hill, Kilgore & Kilgore, Dallas, TX, for Reed Riemer, Lillian Riemer.

Mark W. Gaffney, Rabin & Garland, New York City, Timmy Kent Goss, Capshaw Goss & Bowers, Dallas, TX, for Diane Larson.

George Walter Bramblett, Jr., Noel M. B. Hensley, Kerry McHugh Breaux, Haynes & Boone, Dallas, TX, for Cellstar Corp., Alan H. Goldfield, Terry S. Parker, John S. Bain.

Michael Landon Dinnin, Gregory John Sachnik, Gayle Anne Boone, Bracewell & Patterson, Dallas, TX, Joseph Clifford Gunter, III, Bracewell & Patterson, Houston, TX, for Kenneth W. Sanders.

David Lawrence Peavler, Locke Purnell Rain Harrell, Dallas, TX, Timothy W. Mountz, Baker & Botts, Dallas, TX, for KPMG Peat Marwick, LLP.

Noel M. B. Hensley, Haynes & Boone, Dallas, TX, for Michael S. Hedge, Kenneth E. Kerby, Leonard C. Ratley, Evelyn M. Henry.

George Walter Bramblett, Jr., Haynes & Boone, Dallas, TX, for Daniel T. Bogar, James L. Johnson.

George Walter Bramblett, Jr., Haynes & Boone, Dallas, TX, Michael Joseph Collins, Bickel & Brewer, Dallas, TX, Jay W. Eisenhofer, Blank Rome Comisky & McCauley, Wilmington, DE, for Ronald J. Kramer.

## OPINION

BUCHMEYER, Chief Judge.

This case, which involves alleged violations of federal securities laws,[1] presents a question of first impression in this Circuit regarding the application of the "Lead Plaintiff" provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Reform Act").[2] The State of Wisconsin Investment Board ("SWIB") seeks appointment as the sole Lead Plaintiff to represent the class of stock purchasers against CellStar Corporation, its officers and directors, and its auditor, KPMG Peat Marwick LLP. Opposing SWIB's motion is a group consisting of individual shareholders and the City of Philadelphia (the "CellStar Plaintiffs Group" or the "Group"), which has moved for appointment as the sole Lead Plaintiff, or at least as co–Lead Plaintiff with SWIB.

For the reasons discussed below, this Court grants SWIB's motion to be appointed Lead Plaintiff under the PSLRA, denies the CellStar Plaintiffs Group's request for appointment as co–Lead Plaintiff, and directs SWIB to select and retain counsel of its choice, subject to the Court's approval.[3]

## I.

### THE FACTUAL BACKGROUND

*A. The Private Securities Litigation Reform Act of 1995*

In 1995, Congress perceived a growing threat to the nation's capital markets due to the proliferation of abusive and frivolous shareholder "strike" suits against corporations under federal securities laws. Finding

---

1. Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission (17 C.F.R. § 240.10b–5).

2. Codified at 15 U.S.C. § 78u–4(a)(3)(B).

3. Subsequent to this Court's oral ruling on these issues, SWIB named Grant & Eisenhofer, P.A., as Lead Counsel. The Court approved this selection on April 14, 1997.

that most defendants in these securities fraud cases chose to settle rather than incur the large legal fees and expenses necessarily required for discovery, preparation, and trial, Congress concluded that plaintiffs normally profited from these class actions regardless of the culpability of the defendant. Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730 ("Conference Report").

Especially troubling to Congress was the manipulation of such actions by lawyers—i.e., securities class litigation had become "lawyer-driven"—and by "professional plaintiffs," who owned only small interests in many different companies and who stood willing to lend their names to these class actions in exchange for an extra "bounty" payment upon settlement. Conference Report at 731–34; Report on the Private Securities Litigation Reform Act of 1995, S.Rep. No. 98, 104th Congress, 1st Sess. 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685 ("Senate Report"). Specialized securities litigation firms had researched potential targets for these suits, enlisted plaintiffs, controlled the course of litigation, and often negotiated settlements that resulted in huge profits for the law firms with only marginal recovery for the shareholders. Senate Report at 685.

At the same time, Congress acknowledged the value of private securities litigation to the integrity of American capital markets. Meritorious suits, it found, maintained public and private confidence in the markets and served as strong deterrents to illegal action and nondisclosure by corporate fiduciaries. Conference Report at 730. Private actions complemented SEC enforcement mechanisms and remained a necessary component of the federal regulatory structure. Senate Report at 687.

As a result of these findings, Congress decided to curb the perceived abuses of shareholder litigation while continuing to encourage meritorious suits. Specifically, Congress intended "to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." Conference Report at 731. This effort resulted in the reforms embodied in the PSLRA, which amended the Securities Exchange Act of 1934 to add Section 21D (codified at 15 U.S.C. § 78u–4).

The Reform Act imposes strict disclosure requirements upon plaintiffs, requiring them to file complaints which describe their transactions in the security at issue, disclose any prior action in which they sought to serve as a class representative in a securities class action lawsuit, and promise not to accept a bounty payment. 15 U.S.C. § 78u–4(a)(2)(A). The plaintiffs filing such class actions must also publish notice within 20 days to the purported plaintiff class advising them of the pendency of the action and of their right to move to serve as Lead Plaintiff in the action. 15 U.S.C. § 78u–4(a)(3)(A).

Most relevant to this case, the PSLRA establishes new rules governing the appointment of a Lead Plaintiff. The court is directed to consider all motions made by purported class members seeking to be appointed Lead Plaintiff and to determine the "member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i). In so determining the "most adequate plaintiff," the court is directed to adopt a presumption that the most adequate plaintiff is the person or group of persons that filed a motion, that "has the largest financial interest in the relief sought by the class," and that "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted only by proof by another member of the purported plaintiff class that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

The Reform Act also directs that discovery regarding whether a member of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if that plaintiff first demonstrates a reasonable

basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class. 15 U.S.C. § 78u–4(a)(3)(B)(iv).

Finally, the Reform Act requires the Lead Plaintiff, "subject to the approval of the court, [to] select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

### B. The Parties and Their Claims

On May 14, 1996, Sidney Gluck and three other individuals (collectively "Gluck") filed a complaint on behalf of themselves and all others similarly situated against CellStar, its officers and directors, and KPMG Peat Marwick LLP as CellStar's auditor (collectively "Defendants"), alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder by the SEC. Specifically, Gluck claims that Defendants disseminated materially false and misleading information to the investing public regarding CellStar between June 27, 1995 and April 19, 1996. The next day, May 15, 1996, pursuant to 15 U.S.C. § 78u–4(a)(3)(A)(i), Gluck published notice of the pendency of the action over Business Wire, a national business-oriented wire service, advising members of the proposed class of their right to move the Court to serve as Lead Plaintiff no later than 60 days from the date of publication of the notice. The adequacy of this notice is not in dispute.

Within the 60 day period, SWIB filed a motion for appointment as Lead Plaintiff in this case.[4] The CellStar Plaintiffs Group (consisting of Gluck and others) also moved for appointment as Lead Plaintiff. However,

in its objection to the SWIB motion, the CellStar Plaintiffs Group changed its position and only sought to be named co–Lead Plaintiff with SWIB. In both its original motion and its objection to SWIB's motion, the CellStar Plaintiffs Group sought court approval of its choice of the Milberg Weiss Bershad Hynes & Lerach LLP law firm ("Milberg Weiss") as Lead Counsel or co–Lead Counsel.

The CellStar defendants objected to the appointment of either SWIB or the Gluck group as Lead Plaintiff, arguing that they were first entitled to discovery on the issue of which competing plaintiff was the "most adequate plaintiff" under the PSLRA.

## II.

### THE PSLRA DETERMINATIONS

#### A. Appointment of Lead Plaintiff

##### 1. The Presumptively Most Adequate Plaintiff

■ It is clear that SWIB satisfies the statutory requirements of the presumptively most adequate plaintiff in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). Specifically, (i) SWIB's motion for appointment as Lead Plaintiff was timely; (ii) it has the largest financial interest of any class member; and (iii) it meets the class requirements of Rule 23.

##### (i) timely filing

First, there is no dispute that SWIB filed a timely motion to be appointed Lead Plaintiff. Its motion was filed within the 60 day period following publication of notice of the pendency of the action over Business Wire, as

---

4. The case has experienced several other procedural contortions since May of 1996. Three other actions were filed by individual plaintiffs on behalf of all others similarly situated against CellStar and its officers and directors, making substantially the same claims as Gluck. These actions were consolidated with the Gluck case on August 16, 1996.

Additionally, these other plaintiffs groups have taken different positions in the Lead Plaintiff battle. Plaintiffs in the Goggin action and class members Farrington, Vittor, Stokes, and the City of Philadelphia (acting through its Board of Pensions and Retirement) have joined Gluck to seek appointment as Lead Plaintiffs, with the law firm

of Milberg Weiss Bershad Hynes & Lerach LLP as lead counsel. Hereinafter this group will be called the "CellStar Plaintiffs Group."

Plaintiffs in the Larson action and class members Hase, Hase, the Aboul–Fetouh family, Gounaris, Katz, and the Band Rosenbaum & Martin P.C. Profit Sharing Plan have joined with SWIB and support the appointment of SWIB as Lead Plaintiff along with its choice of lead counsel. Two other institutional investors, BZW Barclays Global Investors, N.A. and Mellon Bank Corporation, submitted a letter stating that they were members of the purported class and that they also supported SWIB as Lead Plaintiff.

required by 15 U.S.C. §§ 78u–4(a)(3)(A)(i)(II) and 78u–4(a)(3)(B)(iii)(I)(aa).

### (ii) largest financial interest

Second SWIB has the largest financial interest in the relief sought by the class. During the class period, CellStar had over 19 million shares of common stock issued and outstanding. Of these, over 7.5 million shares were held by non-insiders. SWIB held more than 1.6 million of these shares (over 20 percent), and it has demonstrated that it purchased at least one million of its shares during the proposed class period. The overall investment of SWIB in CellStar is about $30 million, and SWIB's preliminary estimate of its loss during the proposed class period is over $10 million.[5]

In contrast, the CellStar Plaintiffs Group, in aggregate, owned only about 58,000 shares of CellStar common stock during the class period, and their aggregate estimated losses total less than $900,000. Even though aggregating the shares of several plaintiffs for purposes of this calculation is proper under the statutory language—"person *or group of persons* that . . . has the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) (emphasis added)—the financial interest of the CellStar Plaintiffs Group is significantly smaller than that of SWIB.

### (iii) Rule 23 requirements

Third, SWIB has sufficiently demonstrated to this Court that it satisfies both the typicality and adequacy requirements of Rule 23 of the Federal Rules of Civil Procedure to the degree required by the statute. A comprehensive reading of the statute reveals that, at this stage of the proceedings, SWIB need only make a preliminary showing that it satisfies these requirements. *See D'Hondt v. Digi International, Inc.,* Nos. CIV 97–5 JRT RLE, etc., 1997 WL 405668 at *2 (D.Minn., April 3, 1997) ("[I]f Congress had intended an aggressive inquiry by the Court, into the qualifications of a claimant to serve as a Lead Plaintiff, it was an intent that Congress

chose not to express."); *Fischler v. AmSouth Bancorporation,* No. 96–1567–Civ–T–17A, 1997 WL 118429 at *2 (M.D.Fla., Feb.6, 1997) ("A wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification."). Indeed, the Reform Act allows discovery regarding these elements *only* if another purported member of the class can demonstrate a reasonable basis for finding the presumptively most adequate plaintiff incapable of adequately representing the purported class—which, as discussed below, the CellStar Plaintiffs Group did not do. 15 U.S.C. § 78u–4(a)(3)(3)(iv). Furthermore, Congress clearly did not intend to burden prospective Lead Plaintiffs by requiring extensive evidentiary proof of typicality or adequacy in a "Reform Act" designed to reduce the costs of securities class actions and to induce institutional investors to become Lead Plaintiffs. Evidence regarding the requirements of Rule 23 will, of course, be heard in full at the class certification hearing. There is no need to require anything more than a preliminary showing at this stage.

SWIB has, without question, made the required preliminary showing of typicality and adequacy. If successful in proving its injury and losses resulting from the CellStar Defendants' allegedly fraudulent scheme, SWIB will necessarily prove the conduct which underlies the claims of all purported plaintiffs, just as it will establish the elements of those claims; accordingly, SWIB's claims are typical of those of the purported class members. In addition, SWIB is well suited to adequately represent the purported class. It has a significant financial interest in the litigation and it conducted a thorough search for competent counsel. Also, as an institutional investor, it is accustomed to acting in the role of a fiduciary, and its experience with investing and financial matters will only benefit the class. *See In re California Micro Devices Securities Litigation,* 168 F.R.D. 276, 278 (N.D.Cal.1996). Therefore, the Court adopts the presumption that SWIB is the most ade-

---

**5.** Because the result reached in this decision is based solely on SWIB's financial interest, it is not necessary for the Court to consider the shares held and the losses incurred by the other plaintiffs who support SWIB's motion.

quate plaintiff under 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

As noted above, this finding does not preclude CellStar or the other defendants from contesting class certification on these bases at a later date. *See Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 60–61 (D.Mass. 1996) ("[The court's] determination to appoint a person or persons as lead plaintiff must be without prejudice to the possibility of revisiting that issue in considering a motion for class certification"); *In re Cephalon Securities Litigation*, No. Civ. A. 96–CV–0633, Fed. Sec. L. Rep. ¶ 99,313, 1996 WL 515203 (E.D.Pa., Aug.27, 1996); Conference Report at 733. Nor does it preclude the Court from considering arguments raised by other purported class members under the next section of the statute, 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II), which contains the criteria for rebutting the presumption.

#### 2. Presumption Not Rebutted

■ The CellStar Plaintiffs Group does not attempt to rebut directly the presumption that SWIB should be appointed Lead Plaintiff. Rather, it argues that because SWIB is potentially subject to typicality and adequacy challenges by Defendants, the Court should appoint the CellStar Plaintiffs Group as "co–Lead Plaintiffs" along with SWIB.

However, this argument fails to recognize that the provisions of the Reform Act clearly delineate the procedure for the Court's determination of the Lead Plaintiff. Under them,[6] a member of the purported plaintiff class who wishes to challenge the appointment of a presumptively most adequate plaintiff must present proof that the presumptively most adequate plaintiff either (i) will not fairly and adequately protect the interests of the class or (ii) is subject to unique defenses that render that plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). If the challenging member of the purported class can demonstrate a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class, then discovery on the issue may be conducted before the Court appoints a Lead Plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(iv).

There is, of course, a marked difference between affirmatively demonstrating that SWIB is not an adequate representative or is subject to unique defenses and simply claiming that SWIB *might be* subject to such arguments in the future. The CellStar Plaintiffs Group has utilized the latter approach, simply alleging that the *Defendants might later challenge* SWIB because it is a "sophisticated" investor, its purchase dates of shares differ from those of other purported class members, and its chosen counsel is inadequate.[7] Such speculative assertions are insufficient to rebut the presumption that SWIB is the most adequate plaintiff. The

---

6. 15 U.S.C. § 78u–4(a)(3).

7. The *CellStar Plaintiffs Group*, in its Reply Brief on this issue, states very clearly that it is not arguing directly that SWIB is atypical or inadequate:

> [I]t should be emphasized that the CellStar Plaintiffs Group is not critical of SWIB nor its counsel and has never suggested that their application should be rejected in total. Rather, we have pointed to the likely arguments and contentions that defendants would make—as they now give every indication of making—and we have suggested that in that context a broadening of class representation and their lead counsel would be the most prudent course in protecting the interests of all absent class members in this litigation.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> [T]here are certain facts and matters of public record which could potentially subject SWIB to challenges by defendants in terms of SWIB's typicality and/or adequacy to serve as a class representative under Rule 23, including potential unique defenses. At the very least, these factors, if raised by defendants, could be the subject of lengthy and costly litigation which would preoccupy SWIB, delay and protract these proceedings and potentially deprive the Class of its representation if SWIB is ultimately disqualified under Rule 23 due to such considerations.
>
> Reply Brief at 2.

statute requires the CellStar Plaintiffs Group to present "proof" of its assertions; or, if it requires discovery to gather such proof, to "demonstrate a reasonable basis" for a finding of inadequacy. 15 U.S.C. §§ 78u–4(a)(3)(B)(iii)(II) and (a)(3)(B)(iv). Here, the CellStar Plaintiffs Group does neither.

In addition, the CellStar Plaintiffs Group's major arguments center on SWIB's character as an institutional investor. However, through the PSLRA, Congress has unequivocally expressed its preference for securities fraud litigation to be directed by large institutional investors. Institutional investors own over 50 percent of U.S. equity securities, Conference Report at 733, and Congress was certainly aware that an institutional investor will usually have "the largest financial interest in the relief sought" in securities class actions. The legislative history of the Reform Act is replete with statements of Congress' desire to put control of such litigation in the hands of large, institutional investors. For example:

> The [pre–PSLRA] system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions. The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."
>
> \* \* \* \* \* \*
>
> Cumulatively, [small] investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake. The claims of both types of class members generally will be typical.

Conference Report at 733. By expressing a strong preference for institutional investors to be Lead Plaintiffs, Congress rejected typicality and adequacy objections like those of the CellStar Plaintiffs Group.

In particular, with respect to the Group's assertion that SWIB might not be an adequate representative because it would litigate the case with an eye toward balancing the long term interests of CellStar with the interests of the class, Congress has precluded this argument from being a valid challenge to the appointment of an institutional investor as Lead Plaintiff. Clearly Congress intended that institutional investors consider such interests, as evidenced by the legislative history of the Reform Act: "[t]he Committee believes that an institutional investor acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors." Senate Report at 690.

This balancing is also economically sound. The best relief for the plaintiff class is not always the relief which would be sought by a "professional plaintiff" or a plaintiff with a very small share in the defendant company. As discussed above, lawyers for such plaintiffs have strong incentives to seek the maximum damage award possible without regard to future company performance or share appreciation. Yet overall return to the plaintiff class would, in some circumstances, be maximized through a less-than-maximum damage payment immediately and subsequent faster growth of company value. Though considering the long term interests of defendant companies might in some circumstances reduce the immediate damage payments to the plaintiff class (and, consequently, the payment to plaintiffs' lawyers), it will also improve the chances that the company will experience future growth. If an institutional investor, which represents the long-term interests of many small investors, decides that a certain form of relief is appropriate, it is more likely superior for the majority of investors than the relief which would be sought by a "professional plaintiff's" lawyer. *See generally In re California Micro Devices Securities Litigation,* 168 F.R.D. 257, 275–76 (N.D.Cal.1996); *In re California Micro Devices Securities Litigation,* 965 F.Supp. 1327, 1330 (N.D.Cal.1997); *Ravens v. Iftikar,* 1997 WL 405110 at \*7, —— F.Supp. ——, —— (N.D.Cal., July 16, 1997).

Therefore, this Court appoints SWIB as the Lead Plaintiff in this litigation.

**B. Should the Court Appoint Co–Lead Plaintiffs?**

■ The primary objective of the CellStar Plaintiffs Group seems to be its appointment as co–Lead Plaintiff with SWIB. The Group argues that its appointment as co–Lead Plaintiff will render the Lead Plaintiffs less susceptible to a challenge by Defendants at the class certification stage.

However, one of the principal goals of the PSLRA was to remove "repeat-player" plaintiffs' lawyers from the control of securities litigation and to vest that control with large investors. The legislative history of the Reform Act contains numerous references to evidence that plaintiffs' counsel in securities class actions make decisions based on their own financial interests rather than those of their purported clients. Indeed, Congress singled out the law firm representing the CellStar Plaintiffs Group in this action for much of the .criticism, stating that this firm filed 229 different suits over forty-four months and citing one of its partners as saying, " 'I have the greatest practice of law in the world. I have no clients.' "[8] Report on the Common Sense Legal Reform Act of 1995, H.R. Rep. No. 50, 104th. Cong., 1st Sess. 16 (1995) ("House Report"); Senate Report at 685. It has also been estimated that the same firm was involved in twenty percent of the securities suits which were pending in 1993. See William P. Barrett, I Have No Clients, Forbes, Oct. 11, 1993. To cure these perceived abuses, Congress chose to "increas[e] the role of institutional investors in securities class actions," Senate Report at 685, and it declared that these institutional investors, as Lead Plaintiffs, should "actively represent the class" and "drive the litigation." Id. at 689.

The best way for the Court to effectuate the purposes of the Reform Act is to appoint SWIB to serve as sole Lead Plaintiff. Increasing the number of Lead Plaintiffs would detract from the Reform Act's fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representatives more reliant on the lawyers. See In re Donnkenny Inc. Securities Litigation, 171 F.R.D. 156, 157–58 (S.D.N.Y.1997). It would also reduce the influence and responsibility of SWIB, something Congress clearly did not wish the Court to do. Further, appointing co–Lead Plaintiffs would unnecessarily increase the time and expense spent on preparing and litigating the case, especially if the co–Lead Plaintiffs decided to hire co–Lead Counsel.

Co–Lead Plaintiffs might be appropriate in certain situations, such as two institutional investors with roughly equal economic losses

---

8. Melvin Weiss, one of the firm's name partners, did little at oral argument to persuade the Court that Congress' impression of his firm was mistaken. In an apparent attempt to persuade the Court that his law firm was far superior to SWIB's firm—Blank, Rome, Comiskey & McCauley—he emphasized his success in recovering large damages awards:

> We've been in the biggest cases of this type in the history of the country. All the Milken cases before Judge Pollack in New York, the Keating case, the Washington Public Power Supply System Litigation. These are cases where we recovered three-quarters of a billion and a billion dollars. Nobody could ever accuse Milberg Weiss of not being highly skilled and experienced in these kinds of cases. I have sued and recovered from six Big Six accounting firms more than anybody in this country. I don't see any experience from [Blank, Rome] in handling a case against a Big Six accounting firm.
>
> \* \* \* \* \* \*
>
> In the Milken–Drexel cases before Judge Pollack, I was co–lead counsel with Pervas, Wayne & Moore, one of the major defense

firms in this country, and we worked things out. We put together a $2 billion resolution of that matter.

\* \* \* \* \* . +

> The biggest case up to that point in my life that I ever handled was the WPPS case, the Washington Public Power Supply litigation, and I recovered, along with my co–lead counsel, $750 million. We worked on that case for seven and a half years and we made a fee application and the court gave us straight hourly time. After seven or eight years of hard litigation, we settled it during the trial. I took that risk and then I appealed it and I got it reversed and remanded, and even at that point we only got two times our lodestar, which was a kick in the head for every lawyer in that case.

Transcript of Status Conference Hearing, October 1, 1996.

in a particular case, or two or more smaller investors with roughly equal interests where there is no plaintiff with a significantly larger interest than all other plaintiffs. Here, however, where the interest of one institutional investor in the litigation far exceeds the interests of other purported plaintiffs, nothing persuades the Court to appoint co–Lead Plaintiffs.

### C. Lead Counsel

Regarding appointment of Lead Counsel, the statute is clear. The Lead Plaintiff shall select Lead Counsel to represent the class, subject to the Court's approval. 15 U.S.C. § 78u–4(a)(3)(B)(v). Giving the Lead Plaintiff primary control for the selection of counsel was a critical part of Congress' effort to transfer control of securities class actions from lawyers to investors. Conference Report at 734. Thus, the Court directs SWIB to select and retain counsel and to submit its choice to the Court for approval.[9]

### D. Defendants' Opposition to Appointment of Lead Plaintiff

Defendants assert that the record before the Court at this stage is insufficient to allow the Court to determine the most adequate plaintiff and that the Court should allow discovery on whether the moving plaintiffs satisfy the requirements of Rule 23.

■ The statute is clear that only *potential plaintiffs* may be heard regarding appointment of a Lead Plaintiff. For example, Congress directed the Court to "consider any motion made *by a purported class member*" to determine the most adequate plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added). Rebuttal of the presumption of the most adequate plaintiff is limited to "proof *by a member of the purported plaintiff class.*" 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (emphasis added). And discovery regarding the issue "may be conducted *by a plaintiff*" only if "*the plaintiff* first demonstrates a reasonable basis" for finding the presumptively most adequate plaintiff inadequate. 15 U.S.C. § 78u–4(a)(3)(B)(iv) (emphasis added); *see*

*Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 60 (D.Mass.1996).

Furthermore, requiring evidentiary proof of the Rule 23 requirements at the Lead Plaintiff appointment stage (absent a showing of a reasonable basis by another plaintiff) would vitiate Congress' intent to provide for a speedy Lead Plaintiff determination, to pass the reins of the litigation to large investors at an early stage, and to eliminate unnecessary expenses in securities litigation. Congress intended that appointment of a Lead Plaintiff occur at an early stage of the litigation, before consideration of certification issues. The Reform Act promulgates a timetable requiring Lead Plaintiff appointment to occur "[n]ot later than 90 days" after publication of notice of pendency of the action or, if actions are consolidated, "[a]s soon as practicable after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u–4(a)(3)(B)(i)–(ii). Also, throughout the text of the Lead Plaintiff provisions, the statute refers to "purported class members," rather than "class members." 15 U.S.C. § 78u–4(a)(3); *Greebel.* And, since all of Defendants' Rule 23 arguments may be raised at the class certification stage, allowing a full evidentiary hearing of them now would only result in unnecessary expense and a waste of judicial resources. Wresting control of securities class actions from lawyers with nominal plaintiffs and giving the power to large investors will most benefit all investors if it is done at the outset of the litigation.

Therefore, it is clear that Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation. As noted above, the Court's finding is without prejudice to later typicality or adequacy challenges at the class certification hearing.

### III.

### CONCLUSION

For the reasons stated above, the Court grants SWIB's motion to be appointed Lead Plaintiff, denies the CellStar Plaintiffs

---

9. As noted in an earlier footnote, the Court approved SWIB's choice of Lead Counsel on April 14, 1997.

Group's motion to be appointed co–Lead Plaintiff, and directs that SWIB select and retain counsel of its choice, subject to the Court's approval.[10]

---

**10.** See footnotes 3 and 9, *supra.*