**TAKEDA**

v.

**TURBODYNE TECHNOLOGIES, INC., et al.**

**No. CV 99–00697 MMM (BQRx).**

United States District Court, C.D. California.

May 28, 1999.

Ira M. Press, Daniel Hume, Kirby, IcInerney & Squire, New York City, Lionel Z. Glancy, Peter Arthur Binkow, Lionel Z. Glancy Law Offices, Los Angeles, CA, for Plaintiffs.

Daniel J. Tyukody, Jr., Howard M. Privette, Julie Michelle McEvilly, Robert P. Varian, Brobeck, Phleger & Harrison, Los Angeles, CA, for Defendants.

ORDER GRANTING MOTIONS OF ZAKS GROUP AND KADNER GROUP FOR CONSOLIDATION OF .RELATED ACTIONS; GRANTING MOTION OF KADNER–7 FOR APPOINTMENT AS LEAD PLAINTIFFS AND APPOINTMENT OF LEAD COUNSEL; AND DENYING MOTION OF ZAKS GROUP FOR APPOINTMENT AS LEAD PLAINTIFFS AND APPOINTMENT OF LEAD COUNSEL

MORROW, District Judge.

This is a securities fraud action brought pursuant to the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995 ("PSLRA" or the "Reform Act"). Two plaintiff groups move separately for the consolidation of this case with related actions, for their respective appointment as Lead Plaintiffs, and for appointment of their counsel as Lead Counsel.

The six cases allege the same misrepresentations and omissions by Turbodyne and its representatives, and seek to establish definitions of the Class and Class Periods that are either identical to one another or nearly so. All parties that have addressed the issue agree the cases should be consolidated. Consequently, in the interest of judicial economy and to relieve the parties and absent class members of the burdens associated with participating in duplicative litigation, the court concludes that the six related cases should be consolidated.

As respects the moving parties' applications for appointment as Lead Plaintiffs, each has aggregated the claims of hundreds of class plaintiffs in an effort to establish that its group has the greatest stake in this litigation. Evidently recog-

nizing that such unwieldy groups are not capable of directing the litigation effectively, each group has alternatively proposed that a smaller subset of persons be collectively denominated Lead Plaintiffs. Thus, in addition to the larger "Zaks Group" and "Kadner Group" – each comprised of hundreds of persons–smaller, more manageable subsets are also proposed, dubbed the "Zaks–9" and the "Kadner–7" respectively.

The Kadner–7 have collectively suffered losses approaching $1 million, and five of its members suffered the greatest individual losses of any plaintiffs identified to date.[1] The Reform Act requires designation of the person or group with the largest losses as Lead Plaintiff unless another class member successfully rebuts the presumption that such individual or group is the most adequate class representative. The presumption can be rebutted by evidence that the person or group with the largest losses will not fairly and adequately protect the interests of the class, or that the defendants have unique defenses against such individual or group that make adequate representation of the claim impossible. Neither the Zaks Group nor any other class member has offered convincing rebuttal evidence of this type. Additionally, it is the court's view that the Kadner–7 are typical of the class claimants and will adequately represent their interests. Consequently, the court grants Kadner Group's alternative motion for designation of the Kadner–7 as Lead Plaintiffs in this case.

1. Plaintiffs allege that Kadner–7 members sustained the following losses: Ralf Kadner, $327,843.85; Gordon Williamson &. Associates, $286.039 (or $495,764); Louis T. Inglehart, $160.416; Ronald Shoen, $152,159; Gunther Wrieden, $148,490; Combined Atlantic Carriers, $90,514; and Dennis Jones, $71,346.84.

2. *Takeda v. Turbodyne, et al.,* Case No. CV 99–697 MMM (BQRx), Complaint, ¶ 1; *David Roy Linscott v. Turbodyne Technologies, Inc. and Edward Halimi,* Case No. CV–99–00933 MMM (RZx), Complaint, ¶ 1; *Ann Gentile v. Turbodyne Technologies, Inc. and Edward Halimi,* Case No. CV–99–02194 MMM (AJWx), Complaint, ¶ 1; *Helmut Siebert v. Turbodyne*

## I. FACTUAL BACKGROUND

The Complaints filed on behalf of investor-plaintiffs by the Law Offices of Lionel Z. Glancy describe the factual basis of the four suits, the Class, and the Class Period in identical terms. In each case, the plaintiff class encompasses public investors who purchased the common stock of Turbodyne between March 1, 1997 and January 22, 1999 (the "Class Period").[2] The suit brought on behalf of Shmuel Zaks by Weiss & Yourman is based on similar facts and alleges the same Class Period.[3] The suit brought on behalf of G. Giovanni Giammarco by the Law Office of D. Joshua Staub is based on similar facts, although the Class Period is defined as beginning on March 26, 1997, rather than March 1, 1997.[4]

Turbodyne is a Delaware Corporation with its principal place of business in Woodland Hills, California. Turbodyne and its subsidiaries design, develop, manufacture, and market proprietary products that enhance performance and reduce emissions of internal combustion engines. They also manufacture aluminum cast automotive products, including engine components and aftermarket specialty wheels.[5]

Turbodyne was listed on the Vancouver Stock Exchange until July 19, 1997. It commenced listing on the NASDAQ Small Capital Exchange on March 24, 1997.[6] The suits allege that throughout the time Turbodyne traded on both the Vancouver

*Technologies, Inc. and Edward Halimi,* Case No. CV–99–01288 MMM (RCx), Complaint, ¶ 1.

3. See *Shmuel Zaks v. Turbodyne Technologies, Inc., Edward Halimi, Walter F. Ware and Leon E. Nowek,* Case No. CV–99–00743 MMM (RZx), Complaint, ¶ 1.

4. See *G. Giovanni Giammarco v. Turbodyne Technologies, Inc., and Edward Halimi,* Case No. CV–99–02751 MMM (Ex), Complaint, ¶ 1.

5. *Id.,* ¶ 2.

6. *Id.,* ¶ 3.

Exchange and NASDAQ, it issued a series of public statements that portrayed it as a booming company, which was experiencing and would continue to experience rapidly rising sales and profits on its core products and new product offerings. Plaintiffs contend that these public statements included material omissions and misleading statements regarding the demand for and market acceptance of Turbodyne's products, the strength of its technologies and competitiveness, and the trends in its business. Plaintiffs further allege that these statements drove Turbodyne's stock price up to approximately $16 per share.[7]

The asserted public statements represented, *inter alia*, that Turbodyne's "breakthrough" technology was protected by more than 30 granted and pending patents in the United States and internationally, that the United States Environmental Protection Agency had certified certain of Turbodyne's products for special urban bus retrofitting projects, that the United Nations had endorsed the company's products, and that a United Nations representative had accompanied defendant Halimi to London and Moscow to assist in product sales negotiations.[8]

The false and misleading nature of defendants' public statements allegedly remained undisclosed throughout the Class Period. On January 22, 1999, the last day of the Class Period, NASDAQ announced that it would join with EASDAQ, and halt trading in Turbodyne stock until at least February 3, 1999. The EASDAQ Market Authority initiated disciplinary proceedings against Turbodyne for allegedly issuing false and misleading price sensitive information to the investing public.[9]

Two plaintiffs groups have filed motions seeking to consolidate this case with others pending before the court, requesting appointment as Lead Plaintiffs, and seeking approval of their respective counsel as Lead Counsel. When multiple putative classes assert substantially the same claim under the Reform Act, a court should first consolidate the actions (see 15 U.S.C. § 78u–4(a)(3)(B)(ii)), and as soon as practicable thereafter, appoint as lead plaintiff, "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members" (15 U.S.C. § 78u–4(a)(3)(B)(i)). If several persons or entities seek to represent the class, the Reform Act establishes a presumption that the person or entity with "the largest financial interest in the relief sought by the class" is the "most adequate plaintiff" and may be designated Lead Plaintiff. See 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). That plaintiff then may select counsel to represent the class, subject to the court's approval. See 15 U.S.C. § 77z–1(a)(3)(B)(v). The expectation is that the person or group with the largest financial stake can best prosecute the claims, and will best be able to select, negotiate with, and monitor class counsel. The Lead Plaintiff presumption may be rebutted, however, and the district court is charged with oversight of the process. See 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I).

## II. DISCUSSION

### A. Consolidation Of Pending Actions

■ The Private Securities Litigation Reform Act of 1995 ("PSLRA"), requires that courts decide motions to consolidate related securities class actions filed against a defendant, such as these actions against Turbodyne, prior to addressing motions for appointment of Lead Plaintiffs brought by competing plaintiff groups. See 15 U.S.C. § 78u–4(a)(3)(B)(ii).[10] Rule 42(a) of

---

7. *Id.,* ¶ 4.

8. *Id.,* ¶ 5.

9. *Id.,* ¶ 6.

10. That section provides: "If more than one action on behalf of a class asserting substan-

tially the same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (1) until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall

the Federal Rules of Civil Procedure provides:

> "When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary cost or delay."

See Fed.R.Civ.P. 42(a).

The PSLRA directs that cases should be consolidated where, as here, there is "more than one action on behalf of a class asserting substantially the same claim or claims." See 15 U.S.C. § 78u–4(a)(3)(B)(ii). Neither Rule 42 nor the PSLRA demands that the actions be identical before they may be consolidated. Rather, in deciding whether to consolidate actions under Rule 42(a), a court must balance the savings of time and effort consolidation will produce against any inconvenience, delay, confusion, or prejudice that may result.[11]

The court has reviewed the complaints in the six separate cases on file, all of which involve nearly identical claims.[12] The four complaints filed by plaintiffs Takeda, Linscott, Gentile, and Siebert allege a Class Period of March 1, 1997 to January 22, 1999. This is identical to the class period asserted in *Shmuel Zaks v. Turbodyne, et al.*, and differs only slightly from the March 26, 1997 through January 22, 1999 period alleged in the sixth case, *Giammarco v. Teledyne, et al.* Courts have generally held that differing class periods alone will not defeat consolidation or create a conflict.[13] Here, all of the claims are based on the same alleged misrepresentations and omissions. Moreover, plaintiffs purchased and sold their Turbodyne shares in the same two markets. There is substantial overlap in the defendants named in the several suits. Turbodyne and Halimi are named in all the suits; the Zaks plaintiffs have added Walter Ware and Leon Nowek. Consolidating these cases for all purposes will be the most efficient solution for the court, and will ease the litigation burden on all parties involved, In fact, both plaintiffs groups have moved for consolidation, and all defendants have indicated that they favor it as well. Absent class members will best be served by consolidation because they will have just one case to monitor as it proceeds through litigation. Thus, because the court finds that the interests of judicial economy and convenience to all parties strongly favor consolidation, and because the court has not identified any inconvenience, delay, confusion, or prejudice that will result, it consolidates the six actions identified above pursuant to Federal Rule of Civil Procedure 42.

### B. Appointment Of Lead Plaintiff

On January 22, 1999, the Law Offices of Lionel Z. Glancy filed the first action

---

appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph."

**11.** See *Burrus v. Turnbo*, 743 F.2d 693, 694 (9th Cir.1984), vacated on other grounds sub nom. *Hijar v. Burrus*, 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985).

**12.** The six cases are: *G. Giovanni Giammarco v. Turbodyne Technologies, Inc., and Edward Halimi*, Case No. CV–99–02751 MMM (Ex); *Ann Gentile v. Turbodyne Technologies, Inc. and Edward Halimi*, Case No. CV–99–02194 MMM (AJWx); *David Takeda v. Turbodyne Technologies, Inc. and Edward Halimi*, Case No. CV–99–00697 MMM (BQRx); *David Roy Linscott v. Turbodyne Technologies, Inc. and Edward Halimi*, Case No. CV–99–00933 MMM (RZx); *Helmut Siebert v. Turbodyne Technologies, Inc. and Edward Halimi*, Case No. CV–99–01288 MMM (RCx); *Shmuel Zaks v. Turbodyne Technologies, Inc., Edward Halimi, Walter F. Ware and Leon E. Nowek*, Case No. CV–99–00743 MMM (RZx).

**13.** See, e.g. *In re Olsten Corp. Securities Litig.*, 3 F.Supp.2d 286, 293 (E.D.N.Y.1998) (consolidating securities fraud class action cases even though the class periods were slightly different); *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, *7 (N.D.Ill.1997) ("varying class periods ... can nevertheless be harmonized because all of the complaints are based upon a common set of operative facts.").

brought against Turbodyne as a result of its alleged misstatements and omissions on behalf of plaintiff David Takeda. The firm caused notice to be published on the Business Wire [14] the same day, within the 20 day period established by the Reform Act.[15] Glancy's notice satisfied the content requirements of the Reform Act by advising of the pendency of the action, the claims asserted therein, the purported class period, and the deadline by which motions to serve as lead plaintiff had to be filed.[16] The Reform Act provides that within "60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. § 78u–4(a)(3)(A)(i)(II). Two motions for designation of lead plaintiff were received within that time period, and are now pending before the court.[17]

Where a court has pending before it one or more class actions arising under the Securities Exchange Act of 1934, the Reform Act directs that a Lead Plaintiff be selected early in the case, and that the Lead Plaintiff's choice of Lead Counsel then be reviewed. The PSLRA provides that

"the court ... shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter ... referred to as the 'most adequate plaintiff')...." 15 U.S.C. § 78u–4(a)(3)(B)(i).

In selecting the lead plaintiff,

"the court shall adopt a presumption that the most adequate plaintiff in any private action ... is the person or group of persons that–(aa) has either filed the complaint or made a motion [for designation as lead plaintiff]; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

This presumption may be rebutted

"only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff–(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately repre-

---

**14.** Neither plaintiff group nor defendants dispute that Glancy's Business Wire posting satisfied the statutory notice requirement. Courts, indeed, have found that such notice meets the requirements of the Reform Act. See, e.g., *Sherleigh Associates LLC v. Windmere–Durable Holdings, Inc.*, 184 F.R.D. 688, 1999 WL 137746, *3 (S.D.Fla. March 19, 1999) (notice posted on the Business Wire was sufficient under the Reform Act); *Christman v. Brauvin Realty Advisors, Inc.*, 1999 WL 47134, *2 (N.D.Ill.1999) (same); *In re Milestone Scientific Securities Litigation*, 183 F.R.D. 404, 413, n. 10 (D.N.J. Oct.22, 1998) (finding that the Business Wire is a business-oriented wire service within the meaning of the PSLRA because it is "widely-circulated"); *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 62 (D.Mass.1996) ("[T]he mere fact that Business Wire arrives at a print publication via an electronic signal, rather than in the manner of a traditional wire service, does not disqualify it as a 'wire service' within the meaning of the statute [for Business Wire is subscribed to by] hundreds of print publications and wire services, encompassing news media in all fifty states" and is thus "widely-circulated").

**15.** The Reform Act's notice requirement provides:

"Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class–(1) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u–4(a)(3)(A)(*l*).

**16.** Compare *id.* with Glancy Decl., Ex. "A."

**17.** The motions of both the Zaks Group and the Kadner Group were filed on March 23, 1999, sixty days after January 22, 1999.

senting the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

### 1. Financial Stake

The Zaks plaintiffs and Kadner plaintiffs have each assembled a group of several hundred investors whose aggregated losses total more than $4 million. The two groups disagree as to which has collectively suffered the greater loss. The court finds it unnecessary to resolve that dispute, because both groups are too large and unwieldy to act effectively as Lead Plaintiffs in this case. A recent case from the District Court for the District of Columbia, *In re Baan Company Securities Litigation,* 186 F.R.D. 214 (D.D.C. 1999), has carefully analyzed how courts should select a Lead Plaintiff group that will be able effectively to manage a securities case. That *Baan* court described the loss of client control that occurs when a class is comprised of many individuals with a modest stake:

> "The mere fact that a proposed lead plaintiff group might have the largest combined financial stake, however, does not guarantee client control. A particular concern arises when lead plaintiff status is sought by a 'group' of persons who were previously unaffiliated, each of whom ha[s] suffered modest losses, and who thus have no demonstrated incentive or ability to work together to control the litigation. The problem is made worse if the members have been recruited by counsel. It ordinarily will be the case that such an assemblage will be unable to manage the litigation and control the lawyers. The net result will be that while the 'group' nominally has a large stake in the litigation, the lawyers will dominate decision-making." *In re Baan Company Securities Litigation,* 186 F.R.D. 214, 223 (D.C.D.C. 1999).

Although the Reform Act contemplates that the Lead Plaintiff may be a *"group* of persons" rather than a single individual (see 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (emphasis added)), district courts applying the Reform Act have frequently construed this to mean a *small* group of manageable size that is capable of joint decisionmaking regarding the litigation. See, e.g., *In re Advanced Tissue Sciences Sec. Litig.,* 184 F.R.D. 346 (S.D.Cal.1998) (winnowing a proposed group of 250 to six, because "[t]he idea of appointing over 250 unrelated individual investors as lead plaintiffs runs afoul of Congress'[ ] intent in enacting the PSLRA"); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 408–09 (D.Minn. 1998) (winnowing plaintiff group of almost 300 to six).

As one court has warned, "[i]ncreasing the number of Lead Plaintiffs [will] detract from the Reform Act's fundamental goal of client control as it [will] inevitably delegate more control and responsibility to the lawyers for the class and make the class representatives more reliant on the lawyers." *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 549 (N.D.Tex. 1997). By emphasizing financial stake, the Reform Act establishes a preference that sophisticated institutional investors direct the course of securities cases. See, e.g., *id.* at 548 ("The legislative history of the Reform Act is replete with statements of Congress' desire to put control of such litigation in the hands of large, institutional investors"); *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 63–64 (D.Mass.1996) (same); *Ravens v. Iftikar.* 174 F.R.D. 651, 661 (N.D.Cal. 1997) ("The Reform Act affords large, sophisticated institutional investors a preferred position in securities class actions.... Congress sought to eliminate figurehead plaintiffs who exercise no meaningful supervision of litigation").

Neither plaintiff group has identified any large institutional investor that seeks to control the case. There are, however, several private investors who lost in excess of $100,000, and who presumably have a significant interest in prosecuting the case. To further the purposes of the Reform Act, it is appropriate for the "court to ensure the transfer of 'primary control of private securities litigation from lawyers to

investors,'" thereby "'empower[ing the] investors so that they, not their lawyers, control private securities litigation'" See *Chill, supra,* 181 F.R.D. at 407 (quoting Conference Report at 683, 685). Ralf Kadner (of the Kadner–7) alleges that he has suffered losses of $327,843.85, more than any other individual investor. Other Kadner–7 members, Gordon Williamson & Associates, Louis Inglehart, Ronald Schoen, and Gunther Wrieden have each suffered losses between $148,000 and $286,000.[18]

The Zaks Group has not identified any significant respect in which the Kadner–7 will not fairly and adequately protect the interests of the class. Nor has it identified any unique defenses to which the Kadner–7 members are subject such that they are incapable of providing adequate class representation. *Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, 2 (N.D.Tex.1997) (where no purported class member presents evidence to rebut the statutory presumption, movants may be appointed as lead plaintiffs).

### 2. Typicality And Adequacy Under Rule 23

"A wide-ranging analysis under Rule 23 is not appropriate [at the initial stage of the litigation] and should be left for consideration on a motion for class certification." *Fischler v. AmSouth Bancorp.,* 1997 WL 118429, *2 (M.D.Fla.1997); see also *Gluck, supra,* 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will,

of course, be heard in full at the class certification hearing. There is no need to require anything more than a preliminary showing at this stage."). Some inquiry into the facts is nonetheless necessary under Rule 23 to determine whether there is reason to believe that the presumptively most adequate plaintiff has interests at odds with the remainder of the class. See *Chill, supra,* 181 F.R.D. at 408–09. This inquiry should "focus[ ] on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is typicality and adequacy." *Gluck, supra,* 976 F.Supp. at 546.

#### (a) Typicality

■ "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the [Lead Plaintiffs] have incentives that align with those of absent class members so ... that the absentees' interests will be fairly represented." *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994) (citation omitted). "Under [Rule 23's] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). "Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the

---

**18.** At the May 3, 1999 hearing on this matter, the Kadner Group argued that Gordon Williamson & Associates resembles an institutional investor since its principal, Williamson, invests on behalf of others and is a professional investment advisor. The court permitted supplemental briefing regarding Williamson's qualifications. The Kadner Group has submitted Williamson's curriculum vitae and declaration, which together reveal that he has authored numerous books on topics including investment strategies and financial planning, and that he has degrees in these and other areas–Williamson holds a J.D., an MBA, and is certified by several financial planning organizations. The Zaks Group argues, however, that some of the losses Williamson claims may have been incurred not by Williamson or his company personally, but on behalf of his

investment clients. (See Declaration of Gordon Williamson, ¶ 2.) Since the Congressional preference was for large, institutional investors, the court fails to see how this detracts from Williamson's suitability as a lead plaintiff. Moreover, Williamson indicates that his company "invests on its own account," so presumably some portion of its loss was incurred in a personal rather than a representative capacity. In addition to Williamson & Associates, the Kadner–7 includes several other individuals whose individual losses are the largest of all class claimants presently before the court. Williamson's inclusion in this group of claimants with significant losses will add sophistication to the group's oversight of counsel, and will further the goals of the Reform Act.

claims of other class members will perforce be based." *Baby Neal, supra,* 43 F.3d at 57–58 (internal quotation marks and citations omitted); *Patrykus v. Gomilla,* 121 F.R.D. 357, 362 (N.D.Ill.1988) (holding that a "representative's claim is typical if it arises from the same . . . practice or course of conduct that gives rise to the claims of the other class members and . . . is based on the same legal theory") (internal quotation marks and citation omitted).

▮ The only respect in which the Kadner–7 plaintiffs are atypical of other class members appears to be the larger size of their losses. Under the Reform Act, that is a proper basis for their selection as Lead Plaintiffs, not a basis for disqualification.

The claims of the Kadner–7 are based on their purchase of Turbodyne stock during the Class Period, allegedly in reliance on the misrepresentations of defendants. The typicality requirement is thus satisfied because their claims arise "from the same event[s] or course of conduct that gives rise to the claims of other class members" and are "based on the same legal theory." See *Baby Neal, supra,* 43 F.3d at 58. The slightly different class period alleged in the *Giammarco* Complaint does not preclude a finding of typicality. "When the complaints are all based upon a common course of conduct, namely the alleged misrepresentations and omissions of [defendant corporation] and its officers and/or directors, the varying class periods may be harmonized." *Milestone Scientific Securities Litigation, supra,* 183 F.R.D. at 416. Nor does it matter that the Kadner–7 group includes German investors, such as Ralf Kadner, or others who purchased Turbodyne stock on the EASDAQ rather than the NASDAQ exchange. A brief review of the roughly 1500 certificates filed by both the Kadner Group and the Zaks Group reveals that hundreds of German investors are included in each group. Thus, the geographical diversity of the Kadner Group is representative of the class as a whole. See *First Merchants*

*Acceptance Corp.,* 1997 WL 461036, *6–7 (small differences in types of investments does not render plaintiff atypical or inadequate). In short, the Kadner–7's losses are of the same kind as other class members, albeit greater in amount, which should ensure that plaintiffs fulfill their role as vigilant monitors of the litigation.

**(b) Adequacy Of Class Representation**

▮ Rule 23(a) requires that the person representing the class be able "fairly and adequately to protect the interests" of all members in the class. Fed.R.Civ.P. 23(a)(4). Whether the class representative will adequately represent the class depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir.1981). The Ninth Circuit has held that representation is "adequate" when counsel for the class is qualified and competent, the representative's interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive. *In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 855 (9th Cir.1982). In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy. See *Riordan v. Smith Barney,* 113 F.R.D. 60, 64 (N.D.Ill.1986).

Each member of the Kadner–7 group has a sufficient interest in the outcome of this case to ensure that the action will be vigorously prosecuted. Ralf Kadner, for example, alleges losses of $327,843.85. Other Kadner–7 members assert losses of $148,000 to $286,000. "Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff[s] to vigorously prosecute the action." *In re Milestone, supra,* 183 F.R.D. at 416. Although the geographical diversity of the Kadner–7 may present some logistical difficulties, the court is confident that these can be overcome, given the stakes involved and the availability of telephone and video conferencing, fax machines, and e-mail.

## C. Defendants' Statement of Objections

■ The PSLRA specifically provides that "the court shall consider any motion *made by a purported class member*" in determining the adequacy of a proposed lead plaintiff. See 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added). See also 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) ("the presumption described in [15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)] may be rebutted only upon proof *by a member of the purported plaintiff class ....*" (emphasis added)). Thus, defendants lack standing to object to the adequacy or typicality of the proposed lead plaintiffs at this preliminary stage of the litigation. See *Gluck, supra,* 976 F.Supp. at 550 ("The statute is clear that only potential plaintiffs may be heard regarding appointment of a Lead Plaintiff.... [I]t is clear that Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation"); see also *Zuckerman, supra,* 1997 WL 314422 at *2; *Greebel,* 939 F.Supp. at 60–61; *Fischler, supra,* 1997 WL 118429, *2 (M.D.Fla.1997) ("The plain language of the Act dictates only members of the plaintiff class may offer evidence to rebut the presumption in favor of the most adequate plaintiff"). Nevertheless, the court may *sua sponte* raise and address certain of the concerns addressed in defendants' statement.

■ Defendants suggest that a Lead Plaintiff group comprising both American and German investors may present serious logistical difficulties, and may include class members whose interests are divergent from those of a majority of the class. Although these issues are more properly addressed at the class certification stage, the court offers certain preliminary views in the hope that they will assist the parties when it comes time to brief the issue fully in the context of a class certification motion.

Defendants cite cases in which courts have refused to certify classes comprised both of Americans and foreign nationals. In those cases, however, there were additional bases for denying certification. See, e.g., *Ansari v. New York University,* 179 F.R.D. 112, 116 (S.D.N.Y.1998) (ruling that a potential plaintiff class of thirty-five members did not satisfy the numerosity requirement, and noting that "[i]f the foreign court would refuse to recognize the preclusive effect of such an action, this fact, *although not dispositive,* counsels against a finding that the class action is superior to other forms of litigation" (emphasis added)); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 127 F.R.D. 454 (S.D.N.Y.1989) (securities fraud case could not be brought as a class action because there were only twenty-five class members, plaintiff's position as underwriter for private stock placement made its claim atypical, and a request that the court use its equitable powers to certify the class under an "opt-in" arrangement to solve res judicata problems under British law suggested that joinder was more appropriate than class certification).[19]

19. Defendants also cite *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), in which the Second Circuit held that a class of foreign investors, including British citizens, could not be certified because, *inter alia,* a judgment in favor of defendants would not bar future actions by absent class members against defendants in the United Kingdom and other countries. See *Id.* at 996–97 ("the record contain[ed] uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a United States judgment in favor of the defendant as a bar to an action by their own citizens") The *Besch* court noted, however, that "an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce a judgment rendered in the United States." *Id.* at 996. Here, the court presently lacks sufficient information to judge the propriety of certifying a class including German investors. It is confident, however, that the issue will be adequately briefed at a later point in the litigation. See *In re Activision Securities Litigation,* 621 F.Supp. 415, 432 (N.D.Cal.1985) (noting that the *Bersch* court "specifically differentiated its case from one where a court was confronted with a mere possibility that a foreign court would not recognize and en-

It is evident there is no *per se* rule against the certification of a class whose members are both foreign and American investors. Nor is there a prohibition against having a mix of foreign and American investors serve as class representatives. See, e.g., *In re Gaming Lottery Securities Litigation*, 1999 WL 102755, *11 (S.D.N.Y. Feb. 25, 1999)(certifying a class composed of both American and Canadian investors, and rejecting defendants' claim that Canadian investors were inadequate class representatives on the basis that it was "without merit"); *Jordan v. Global Natural Resources*, 102 F.R.D. 45, 52 (S.D.Ohio 1984) (conditionally certifying a class where defendants sought to exclude foreign purchasers of stock but failed to adduce evidence that foreign jurisdiction would not give res judicata effect to judgment); *In re U.S. Financial Securities Litigation*, 69 F.R.D. 24, 50 (S.D.Cal.1975) (certifying class and rejecting defendant's contention that "no action could be certified as a class action when any member of the class is a foreigner, simply because a judgment might not be recognized in the foreigner's own country"). Concerns respecting the res judicata impact of any judgment in favor of defendants, which have been the focus of decisional discussion of the difficulties inherent in certifying transnational classes, are not an issue with respect to the selection of Lead Plaintiffs, since those persons will clearly be bound by the judgment of the court.

### D. Selection Of Lead Class Counsel

The PSLRA provides that once the court has designated a lead plaintiff, that plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). A court may disturb the Lead Plaintiff's choice of counsel only if it appears necessary to "protect the interests of the class." 15 U.S.C. § 78u–(a)(3)(B)(iii)(II)(aa). The Kadner–7 has

been proffered as an alternative group by counsel in this case, and the court has, by this order, selected the Kadner–7 as the Lead Plaintiff.

The court has reviewed the résumés of the Law Offices of Lionel Z. Glancy, Kirby McInerney & Squire, and Finkelstein & Krinsk, which the Kadner plaintiffs indicate they will retain as co-Lead Counsel in the event they are appointed Lead Plaintiffs. The court is satisfied that these firms are capable of serving competently as lead counsel in the case. They are experienced in litigating securities class actions on behalf of individual investors. Moreover, the geographical diversity of the three co-Lead Counsel should add to, rather than detract from, the efficient handling of this case. Additionally, the court must approve any award of attorneys' fees and will scrutinize the matter carefully to ensure that services were not unnecessarily duplicated.[20]

### III. CONCLUSION

The court grants the motions to consolidate the six related actions, grants the Kadner plaintiffs' motion that the Kadner–7 be appointed Lead Plaintiffs, denies the Zaks Group's motion for appointment as Lead Plaintiffs, and approves the Kadner–7's selection of co-Lead Counsel.

force a judgment" and reserving the issue pending further developments).

**20.** The Reform Act expressly limits attorneys' fees to "a reasonable percentage of the

amount of damages and prejudgment interest actually paid to the class." See 15 U.S.C. § 78u–4(a)(6).