THE EZRA CHARITABLE TRUST, in-
dividually and on behalf of all others
similarly situated, Plaintiff,

v.

RENT–WAY, INC., Jeffrey A.
Conway and Matthew J.
Marini, Defendants.

No. C.A. 00–323 Erie.

United States District Court,
W.D. Pennsylvania.

March 9, 2001.

Alfred G. Yates, Jr., Law Offices of Alfred G. Yates, Jr., H. Yale Gutnick, Strassburger, McKenna, Gutnick & Potter, Gerald L. Rutledge, Law Offices of Alfred G. Yates, Jr., Pittsburgh, PA, Stanley M. Grossman, Marc I. Gross, Patrick V. Dahlstrom, Paul T. Curley, Pomerantz, Haudek, Block, Grossman & Gross, New York City, Michael G. Lange, Alicia M. Duff, Jeffrey C. Block, Berman, Devalerio & Pease, Boston, MA, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, Daniel E. Bacine, Gerald Rodos, Robert A. Hoffman, Barrack, Rodos & Bacine, Sherrie R. Savett, Todd S. Collins, Berger & Montague, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, Bruce W. Bernard, Bernard, Stuczynski & Bonanti, Erie, PA, Solomon B. Cera, Gold, Bennett, Cera & Sidener, LLP, San Francisco, CA, James D. McDonald, The McDonald Group, Erie, PA, for Plaintiff.

Kevin M. Kearney, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY,

Paul M. Pohl, Bryan D. Kocher, Jones, Day, Reavis, & Pogue, Pittsburgh, PA, Timothy M. Sennett, Knox, McLaughlin, Gornall, & Sennett, Erie, PA, Robert N. Rapp, Calfee, Halter & Griswold, Clevelane, OH, for Defendants.

Jeffrey M. Haber, Wechsler, Harwood, Halebian & Feffer, Timothy MacFall, Bernstein, Liebhard & Lifshitz, New York City, for Movants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

This is a class action on behalf of purchasers of Rent–Way securities seeking damages for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78t(a) and 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Presently pending are five motions for the appointment of lead plaintiff and approval of counsel pursuant to Section 21D(a)(3)(B), as amended, 15 U.S.C. § 78u–4(a)(3)(B). These motions were filed on behalf of the following plaintiffs: 1) Cramer Rosenthal McGlynn LLC ("Cramer"); 2) Florida State Board of Administration ("FSBA"); 3) Mesirow Asset Management ("Mesirow"); 4) Sherleigh Associates, Inc. ("Sherleigh"); and 5) Harold L. Grogan and William R. Latimer ("Grogan/Latimer"). For the reasons that follow, Cramer's motion [Doc. No. 10] is granted and the other motions [Doc. Nos. 4, 8, 11, and 13] are denied.

### I. BACKGROUND

The instant action is a consolidation of numerous securities fraud actions filed against Rent–Way. The facts, as alleged in the Class Action Complaint and purportedly reviewed by each of the proposed lead plaintiffs, are as follows: [1]

---

1. Each of the plaintiffs seeking lead plaintiff status attested to reviewing the Class Complaint in sworn certifications submitted to the Court. These certifications are required under Section 21D(a)(2) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(2).

Rent–Way is a Pennsylvania corporation with its principal place of business in Erie, Pennsylvania. The company rents merchandise such as home entertainment equipment, computers, furniture, and appliances from 1,093 stores located in 41 states. Complaint ¶ 10. As of July 26, 2000, Rent–Way had approximately 24.3 million outstanding shares. The company was actively traded on the New York Stock Exchange during the proposed class period, January 18, 2000 through October 27, 2000.

Defendant Jeffrey A. Conway is the President and Chief Operating Officer of Rent–Way; prior to January 18, 2000, he was the Senior Vice President and Chief Financial Officer. Defendant Matthew J. Marini was the Controller and Chief Accounting Officer during the class period. These defendants are allegedly responsible for the disclosure of material false and misleading statements regarding Rent–Way's true financial position, as well as the concealment of information accurately reflecting the company's financial position. *See* Complaint ¶ 17.

During the proposed class period, Rent–Way released its earnings results for three fiscal quarters. Each of these releases reported increases over the previous year's earnings. On January 18, 2000, the first day of the proposed period, Rent–Way announced its results for the first fiscal quarter ending December 31, 1999:

> ERIE, Pa., Jan.18 /PRNewswire/— Rent–Way, Inc. (N.Y.SE: RWY) today announced record earnings per share of $0.44 (diluted) and an operating margin of 16.0% for the quarter ended December 31, 1999. All historical financial information set forth in this press release has been restated to reflect Rent–Way's merger with Home Choice Holdings, Inc., in December 1998, and the accounting for the merger as a pooling of interests.

> For the first quarter ended December 31, 1999, total revenues were $140.9 million, a 13.7% increase over $124.0 million reported in the same quarter last year. Operating income was $22.6 million, a 418.4% increase over the loss of $7.1 million reported in the same quarter last year, net income was $10.1 million, a 200.8% increase over the loss of $10. 1 million reported in the same quarter last year.

> Same store revenues in core Rent–Way stores increased 5.1%, the fourteenth consecutive quarterly increase between 5% and 8%. Home Choice same store revenue showed sequential improvement, down only 0.9% compared to negative 2.8% in the previous quarter and negative 5.3% in the third quarter of fiscal 199[sic]. "We are excited at the trends we see in customer gain and agreement growth. This, coupled with increased revenue from new merchandise like computers, continue to impact our same store results," said William E. Morganstern, Chairman and CEO.

*PR Newswire*, January 18, 2000; Complaint ¶ 27. On April 18, 2000, Rent–Way announced its earnings for the fiscal quarter ending March 31, 2000:

> ERIE, Pa., April 18 /PRNewswire/— Rent–Way, Inc. (N.Y.SE: RWY) today reported record revenues and earnings per share for its second quarter, ended March 31, 2000. Total revenues of $148.9 million increased 18.4% over the $125.8 million reported in the same quarter and up 5.7% versus the first quarter. Earnings per share were $0.46 (diluted), an increase of 43.8% over the $0.32 reported in the same quarter last year and up to 4.5% versus the first quarter.

> \*    \*    \*    \*    \*    \*

> Same-store revenues in core Rent–Way stores increased 5.1%. Same-store reve-

nues at the Home Choice stores rose 0.6% continuing a trend of sequential improvements at these stores since June 30, 1999.

\*　　\*　　\*　　\*　　\*　　\*

During the first half of fiscal 2000, Rent–Way total revenues were $289.8 million an increase of 16.1% over the $249.7 million reported in the same period last year. First-half earnings per share of $0.90 rose in comparison to the $0.14 loss reported during the first half of 1999. The results for the six months ended March 31, 1999 include $16. 8 million of business combination charges related to rent-Way's merger with Home Choice on December 10, 1998. Excluding these charges, earnings per share rose 80.0% over the 0.50 reported during the first half of 1999.

*PR Newswire*, April 18, 2000; Complaint ¶ 29. This announcement also stated that during this quarter, Jeffrey Conway became the new President and COO, William McDonnell became the new CFO, and the company accelerated its plans for opening new stores from fifty new stores per year to one hundred per year. *See id.* On July 20, 2000, Rent–Way announced its third-quarter earnings:

ERIE, Pa., July 20 /—Rent–Way, Inc. (N.Y.SE"[sic] RWY) today reported record revenues and earnings per share for its third quarter, ended June 30, 2000. Total revenues of $152.1 million increased 24.7% over the $121.9 million reported in the same quarter last year. Earnings per share were $0.47 (diluted), an increase of 30.6% over the $0.36 reported in the same quarter last year.

\*　　\*　　\*　　\*　　\*　　\*

During the quarter, Rent–Way opened 28 new stores. Core Rent–Way same store revenue increases were 7.1%. Home Choice same store revenues in-

creased 2.8% over the same quarter last year.

\*　　\*　　\*　　\*　　\*　　\*

During the first nine months of fiscal 2000, Rent–Way total revenues were $441.9 million, an increase of 18.9% over the 371.7 million reported in the same period last year. Nine-month earnings per share of $1.37 rose, in comparison to the $10.234 reported in the first nine months of fiscal 1999. The results for the nine months ended June 30, 1999 include 16.8 million of business combination charges related to Rent–Way's merger with Home Choice on December 10, 1998. Excluding these charges, earnings rose 59.3% over the $0.86 reported during the first nine months of fiscal 1999.

*PR Newswire*, July 20, 2000; Complaint ¶ 32.

Prior to the market's opening on October 30, 2000, trading in Rent–Way shares was suspended pending a news release. Complaint ¶ 37. The release, issued later that day, reported the following:

ERIE, Pa., Oct. 30 /PRNewswire/—Rent–Way, Inc. (N.Y.SE: RWY-*news* ), today announced that it is investigating certain accounting matters, including possible accounting irregularities, which if confirmed would result in the need to revise earlier reported unaudited financial results for fiscal year 2000. Rent–Way also expects these matters to impact adversely its recently concluded fourth quarter ended September 30, 2000.

Rent–Way has not yet determined the final amount of the revisions nor the allocation of this amount to prior fiscal periods. Rent–Way has also not yet determined the magnitude of the adverse impact on its fourth-quarter results. Based on its preliminary investigation to date, however, Rent–Way

expects these matters to have a negative, non-cash impact of between $25.0 million to $35.0 million pre-tax on fiscal year 2000 earnings. Based on its preliminary investigation to date, Rent–Way expects that no fiscal periods prior to fiscal year 2000 will be affected. Rent–Way had previously announced that it expected to meet consensus analyst estimates for fully diluted earnings per share of $1.83 in fiscal year 2000. Based upon its preliminary investigation to date and taking into account the expected impact of theses [sic] accounting matters, Rent–Way believes it will report fully diluted earnings per share of between $0.88 and $1.14 for fiscal year 2000. Rent–Way does not expect that any of these accounting matters will adversely impact reported revenues in fiscal year 2000. Rent–Way has also announced that Matthew Marini, its Corporate Controller, has been suspended and placed on leave pending completion of the investigation. At the request of the Audit Committee of the Board of Directors, Jeffrey Conway, Rent–Way's President and Chief Operating Officer, has voluntarily relinquished his operating responsibilities and has agreed to assist the Audit Committee in its investigation.

The Audit Committee is conducting an investigation of the matter with the assistance of the company's regular outside counsel, Hodgson, Russ, Andrews, Woods & Goodyear LLP, and special counsel to the Committee, Ross & Hardies, LLP. Hodgson Russ has retained PricewatershouseCoopers LLP to assist in the investigation. Commenting on the announcement, William Lerner, Chairman of Rent–Way's Audit Committee, stated, "Speaking for each member of the Audit Committee, we are firmly committed to completing a thorough, expeditious investigation." Rent–Way will take all appropriate actions dictated by the results of this investigation.

*PR Newswire,* October 30, 2000; Complaint ¶ 37. Trading in Rent–Way stock fell from a closing price of $23.4375 on Friday, October 27, 2000 to as low as $4–3/4 on Tuesday, October 31, 2000 before trading was halted for a second time. Complaint ¶ 38.

## II. DISCUSSION

### A. Selection of Lead Plaintiff under the Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Section 21D of the Exchange Act, as amended, 15 U.S.C. § 78u–4, was enacted to forestall perceived abuses of securities litigation by attorneys having greater financial stakes in the litigation than their clients. *See In re Nice Systems Sec. Litig.,* 188 F.R.D. 206, 214 (D.N.J.1999); *In re Oxford Health Plans, Inc., Sec. Litig.,* 182 F.R.D. 42, 43 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–05 (D.Minn.1998); *Gluck v. CellStar Corp.,* 976 F.Supp. 542, 543–44 (N.D.Tex.1997). Through the PSLRA, Congress sought to " 'empower investors so that they, not their lawyers, control private securities litigation' by allowing the Court to ensure the transfer of 'primary control of private securities litigation from lawyers to investors.' " *See Chill,* 181 F.R.D. at 407 (quoting Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 683, 685).

The PSLRA requires filers of securities class actions to publish notice that an action is pending and that, within 60 days of such notice, any member of the purported plaintiff class may move the court to serve as lead plaintiff. *See* Exchange Act § 21D(a)(3)(A)(i); 15 U.S.C. § 78u–4(a)(3)(A)(i). Within 90 days of the pub-

lished notice, the court is to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members ..." *Id.* at Exchange Act § 21D(a)(3)(B)(i).

A detailed procedure for determining the most adequate plaintiff is set forth in the Act. The first step is the application of a rebuttable presumption:

> ... the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(1);
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure

Exchange Act § 21D(a)(3)(B)(iii)(I). Once the presumptively most adequate plaintiff is established, a member of the purported plaintiff class may rebut the presumption only upon proof that such plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. *See id.* at Exchange Act § 21D(a)(3)(B)(iii)(II). Discovery on this issue is permissible only if the challenging plaintiff demonstrates a reasonable basis for finding that the presumptively most adequate plaintiff is incapable of adequate representation. *See id.* at Exchange Act § 21D(a)(3)(B)(iv). The most adequate plaintiff is entitled to select and retain counsel to represent the class, subject to court approval. *See id.* at Exchange Act § 21D(a)(3)(B)(v). Finally, the PSLRA prohibits "professional plaintiffs" from serving as lead plaintiff more than five times in any 3–year period unless the court specifically permits a plaintiff to exceed this limitation:

> [e]xcept as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3–year period.

*Id.* at Exchange Act § 21D(a)(3)(B)(vi).

### B. Selection of Lead Plaintiff in this Case

#### 1. Largest Financial Interest

Each of the five proposed lead plaintiffs in this case has filed a timely motion seeking appointment as lead plaintiff. *See* Exchange Act § 21D(a)(3)(B)(iii)(I)(aa); 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa). Our first task, therefore, is to determine which of these plaintiffs has the largest financial interest in the relief sought by the class. *See id.* at Exchange Act § 21D(a)(3)(B)(iii)(I)(bb). For the reasons set forth below, we conclude that this plaintiff is Cramer.

An introduction of each of the proposed lead plaintiffs is in order. Cramer purports to have sustained a loss of $10.1 million in connection with its purchase of Rent–Way securities, the largest claimed loss of the proposed lead plaintiffs. *See* Memorandum of Motion for the Appointment of Cramer Rosenthal McGlynn, LLC as Lead Plaintiff at 3. It is an "investment advisor," and does not dispute that it purchased Rent–Way stock for the accounts of its clients rather than for its own account. Reply Memorandum in Support of Cramer Rosenthal McGlynn, LLC's Motion for Appointment of Lead Plaintiff at 5. ("Here, Cramer Rosenthal had complete investment discretion as to which securities to buy for its clients.") *Id.* According to Cramer's Principal and Director of Opera-

tions, the company "offers private equity, small-to-mid-cap value, large cap value and small cap value management to both tax-exempt and taxable clients" and "manages institutional portfolios for a variety of pension, private client, and trust estate accounts." Declaration of Michael J. Marrone at ¶ 1. This declaration also states that Cramer "acts as attorney-in-fact for its clients and is authorized to bring suit to recover for, among other things, investment losses." *Id.* at ¶ 3. Cramer has never before sought lead plaintiff status nor has it served as lead plaintiff in a securities class action. *See* Certificate of Plaintiff, Ex. A to Cramer's Motion to Appoint Cramer Rosenthal McGlynn, LLC Lead Plaintiff, to Approve its Selection of Counsel as Lead Counsel and to Consolidate All Related Actions.

FSBA purports to have suffered the next greatest financial loss, approximately $6 million. *See* FSBA's Memorandum of Law in Support of its Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Choice of Counsel at 1. It describes itself as the "Florida constitutional entity that effects investments for an on behalf of some 15 trust funds, the largest of which is the Florida Retirement System Trust Fund, the pension and retirement fund for employees of the state of Florida." *Id.* at n. 1. Within the three year period preceding this action, FSBA was appointed lead plaintiff in seven separate securities class actions, four of which are still active, and was rejected as lead plaintiff in two other securities class actions. *See* FSBA Sworn Certification at ¶ 4.[2]

The remaining proposed lead plaintiffs claim significantly smaller financial losses than Cramer and FSBA. Mesirow, an investment advisor like and represented by the same counsel as Cramer, purports to have lost $1.6 million. *See* Memorandum in Support of Motion for the Appointment of Mesirow Asset Management as Lead Plaintiff at 1. Sherleigh, self-described as "two entities controlled by Jack Silver, who owns and controls the accounts in which he purchased Rent–Way common stock," purports to have lost $956,838. *See* Sherleigh Associates' Memorandum of Law in Opposition at 12, 16. Finally, the Grogan/Latimer group, comprised of two individuals apparently connected by nothing more than ownership of Rent–Way securities and common counsel, purports to have lost an aggregate amount of $44,470. *See* Memorandum in Further Support of Motion to Appoint Harold L. Grogan and William R. Latimer Lead Plaintiff at 3.[3] The Grogan/Latimer group asserts that, should it not be appointed lead plaintiff, it should be appointed co-lead plaintiff because the combination of individual investors and an institutional investor would result in better, more diversified, representation. *See generally id.*

■ Facially, therefore, it appears that Cramer has sustained the largest loss in connection with its purchase of Rent–Way securities. FSBA and other proposed lead plaintiffs argue, however, that because Cramer purchased its securities on behalf of its clients rather than on its own behalf, it in fact suffered no loss and cannot be

---

**2.** It appears that, in addition to serving as lead plaintiff in a number of cases, FSBA is also a frequent non-lead plaintiff in securities actions. By one account, the entity was a party in at least 14 securities cases as of the end of 1999. *See* Declaration of Steven O. Sidener, Partner at Gold Bennett Cera & Sidener, at 1.

**3.** The Court is aware of only one dispute concerning the calculation of financial loss by the parties. Cramer asserts that FSBA used a lower "plug price" than it did to calculate its losses, resulting in an inflated loss for FSBA compared to Cramer. At this stage in the litigation, this dispute is immaterial.

appointed lead plaintiff. FSBA, in particular, argues that Cramer lacks standing under the federal securities laws and in any event is an inappropriate lead plaintiff under the PSLRA by virtue of the fact that it did not suffer an out-of-pocket loss. *See generally* FSBA's Memorandum of Law in Opposition to the Lead Plaintiff Motions of Other Movants and In Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of its Choice of Counsel. FSBA also makes the related argument that Cramer does not qualify as a "real party in interest" under Federal Rule of Civil Procedure 17(a). We disagree with each of FSBA's arguments.

With respect to its standing argument, FSBA asserts that because Cramer acquired its Rent–Way securities for the accounts of its clients rather than for its own account, it suffered no loss on its acquisition and therefore cannot qualify as a "purchaser" under the federal securities laws. *See id.* at 8–9. In support of this argument, FSBA largely relies on two unpublished opinions which found that investment funds, rather than the advisors who acquired securities for these funds, were purchasers at least in part because the funds sustained direct asset loss. *See Competitive Assocs., Inc. v. Int'l Health Sciences, Inc.,* No. Civ. A. 72–1848, 1972 WL 350 (S.D.N.Y. October 10, 1972) and *Financial Programs, Inc. v. Foss Financial, Inc.,* No. 72–848, 1973 WL 458 (D.Or. June 6, 1973). At least two more recent cases, however, have held that investment advisors with the delegated authority to make investment decisions for clients are purchasers under the securities laws. *See Monetary Mgmt. Group of St. Louis, Inc. v. Kidder, Peabody, & Co., Inc.,* 604 F.Supp. 764 (E.D.Mo.1985) and *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D.

602 (S.D.N.Y.1989). Additional cases have found that the delegation of substantial investment discretion may disqualify the delegating party from purchaser status. *See Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.,* 800 F.2d 177 (7th Cir.1986) (church that delegated complete investment authority to advisor was not a "purchaser"); *Medline Indus., Inc. v. Blunt, Ellis & Loewi, Inc.,* No. C.A. 89–4851, 1993 U.S. Dist. LEXIS 581 at *6, 1993 WL 13436 at *2 (N.D.Ill. Jan. 20, 1993) (issue of fact as to whether plaintiff who had record title to securities but did not appear to participate in investment decisions qualified as a "purchaser"). We find these more recent cases persuasive.

As discussed in *Monetary Management,* the federal securities laws do not use the terms "purchaser" and "owner" interchangeably. *Monetary Mgmt.,* 604 F.Supp. at 766 ("Unlike § 16(b) of the 1934 Act, § 12(2) of the 1933 Act does not expressly require that a plaintiff be an owner. It merely requires that a plaintiff be a purchaser."). It is undisputed in this case that Cramer independently determined which securities to purchase for its clients' accounts. Reply Memorandum in Support of Cramer Rosenthal McGlynn, LLC's Motion for Appointment of Lead Plaintiff at 5. ("Here, Cramer Rosenthal had complete investment discretion as to which securities to buy for its clients."). Because of this unrestricted decision-making authority, we conclude that Cramer is a "purchaser" under the federal securities laws with standing to sue in its own name.

We also reject FSBA's contention that Cramer's incentive to vigorously litigate this case is lessened by the fact that it did not suffer an out-of-pocket loss on its purchase of Rent–Way securities.[4] While it

---

**4.** In support of this argument, FSBA directs the Court to an unpublished opinion, *In re Tyco International, Ltd. Sec. Litig.,* No. 00–

MD–1335–B, slip op. (D.N.H. July 19, 2000), in which the court requested additional information from two money management mem-

appears that no case law has yet discussed the propriety of appointing an investment advisor as sole lead plaintiff in a securities fraud class action, several courts have appointed lead plaintiff groups of which investment advisors were members. *See Local 144 Nursing Home Pension Fund v. Honeywell International, Inc.*, No. C.A. 00–3605, 2000 U.S. Dist. LEXIS 16712 at *14, 2000 WL 33173017 at *4 (D.N.J. Nov. 16, 2000); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 111 (D.N.J.1999); *In re Milestone Scientific Sec. Litig.*, 183 F.R.D. 404, 418 (D.N.J.1998); *In re Sunbeam Sec. Litig.*, No. C.A. 98–8258, 1998 U.S. Dist. LEXIS 21490 at *10 (S.D.Fla. Dec. 7, 1998); *Takeda v. Turbodyne Technologies, Inc.*, 67 F.Supp.2d 1129, 1136 (C.D.Cal. 1999). The restriction FSBA urges us to adopt would, in our view, eliminate a number of potentially highly capable lead plaintiffs based on an unduly narrow interpretation of "financial interest" under the PSLRA. In this instance, we are satisfied that Cramer has the requisite experience and incentive to serve as lead plaintiff. Cramer has a significant financial interest in attempting to recover the $10.1 million allegedly lost by its clients in order to maintain their goodwill and future business. Thus, Cramer's incentives to vigorously litigate this case include business considerations not shared by the non-management proposed lead plaintiffs.

FSBA's second argument that Cramer is not a real party in interest under Federal Rule 17(a), is a variation on its first argument. Both *Monetary Management* and *Lemanik* addressed this issue in conjunction with the standing issue and found that the respective investment advisors met the Rule 17(a) standard. As made clear in *Lemanik*, the preeminent concern in Rule 17(a) determinations is whether the suing party has sufficient legal rights to ensure that the outcome of the case will be *res judicata:*

> The test in all such cases is whether plaintiff has "such right as to afford [defendant] the protection of *res judicata* when the suit is terminated." *Blau v. Lamb*, 314 F.2d 618, 620 (2d Cir.1963), *cert. denied*, 375 U.S. 813, 84 S.Ct. 44, 11 L.Ed.2d 49 (1963). Lemanik is a "purchaser" within the meaning of §§ 12(2) and Rule 10b 5 and as such is entitled, as a matter of law, to bring this action in its own name, whether it was acting for its own account or that of its clients.

*Lemanik*, 125 F.R.D. at 607. Because here, as in *Monetary Management* and *Lemanik*, Cramer is in privity with its clients, we have little difficulty concluding that Rent–Way would be afforded the protection of *res judicata* upon the conclusion of this suit, and therefore that the Rule 17(a) standard is met.

In sum, we conclude that Cramer is not barred from serving as lead plaintiff by virtue of the fact that it is an investment advisor. We also conclude that Cramer has the largest financial interest in the relief sought by the purported class in this case. FSBA's challenges to Cramer's motion are ultimately reducible to the proposition that only out-of-pocket losses may be considered in the determination of the

---

bers of a proposed lead plaintiff group in order to determine whether the members took "record/legal and/or beneficial/equitable title" to certain securities. *Id.* at 7. In dicta, the court stated that the unresolved factual issues "at least potentially raise a number of significant questions concerning standing and the lead plaintiff determination" and further that "even if a broker or agent who purchases securities on behalf of a customer or principal has standing to sue for alleged securities fraud, there are substantial legal questions as to whether such person is an appropriate lead plaintiff ... under the PSLRA." *Id.* at 7, 8. We do not find Tyco persuasive. In addition to being unreported, the relevant statements are dicta and do not resolve the questions before this Court.

plaintiff or group of plaintiffs having the greatest financial interest in the relief sought in a securities fraud case under the PSLRA. We decline to adopt this narrow interpretation because we find no support for it in the language or legislative history of the Act, and also because we find that eliminating an entire class of potential lead plaintiffs that may often be strongly aligned with plaintiff classes as well as competent to adequately oversee the efforts of counsel would not best serve the purposes of the Act. *See In Re Nice Systems Sec. Litig.*, 188 F.R.D. 206, 214 (D.N.J.1999); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y.1997) (purpose of PSLRA is to "ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market ... control the litigation, not lawyers.") (citing Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730–34). In this case, for the reasons discussed above, we find that Cramer's financial interest is so aligned with its clients' financial interests that the two are synonymous. Thus, because the $10.1 million loss sustained by Cramer's clients far exceeds the other claimed losses in this case, we conclude that Cramer has the greatest financial interest in the relief sought in this action.

### 2. Rule 23 Requirements

In addition to sustaining the greatest financial loss, the presumptively most adequate plaintiff in a securities class action must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." Exchange Act § 21D(a)(3)(B)(iii)(I); 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). At this stage in the proceedings, the proposed lead plaintiff's burden is satisfied upon making a prima facie showing that it satisfies the Rule's standards. *Greebel v. FTP Software,* 939 F.Supp. 57, 64 (D.Mass.1996). The typi-

cality requirement of Rule 23 demands that a representative's claims arise from the same event, practice or course of conduct that gives rise to the claims of the class members and be based on the same legal theory. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir.1992). The adequacy of representation turns on two factors: 1) whether the plaintiff's attorney is qualified, experienced, and generally able to conduct the proposed litigation; and 2) whether the plaintiff has interests antagonistic to the class. *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 247, *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). We are satisfied based on the information provided by Cramer Rosenthal that it has satisfied its burden.

Grogan/Latimer, however, contend that they should be appointed co-lead plaintiff because "[w]here there is an institution and a narrowly-defined group of individual investors (as here), the courts have not hesitated to appoint co-lead plaintiffs to represent the institutional and individual interests of the class." Memorandum in Further Support of Motion to Appoint Harold L. Grogan and William R. Latimer Lead Plaintiff at 4–5 (citations omitted). We find no reason to appoint a co-lead plaintiff in this case. The Grogan/Latimer group has not established that its perspective as a small group of individual investors will materially add to the overall quality of lead representation in this case, and we are unwilling to appoint a co-lead plaintiff absent this showing. The group claims the smallest financial loss of the proposed lead plaintiffs, and further, appears to be connected by nothing more than common counsel. The aggregation of disparate investors solely for the purpose of establishing a plaintiff group is contrary to the purposes of the PSLRA, and has been strongly disfavored

by the courts. *See In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 810–811 (N.D.Ohio 1999); *In re Milestone Scientific Sec. Litig.*, 183 F.R.D. 404, 418 (D.N.J. 1998); and *Sakhrani v. Brightpoint, Inc.*, 78 F.Supp.2d 845, 847 (S.D.Ind.1999). We therefore decline to appoint Grogan/Latimer as co-lead plaintiff.

### 3. The Presumption Stands

Once the presumptively most adequate plaintiff is established, a member of the purported plaintiff class may rebut the presumption only upon proof that such plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. *See* Exchange Act § 21D(a)(3)(B)(iii)(II), 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Discovery on this issue is permissible only if the challenging plaintiff demonstrates a reasonable basis for finding that the presumptively most adequate plaintiff is incapable of adequate representation. *See id.* at Exchange Act § 21D(a)(3)(B)(iv).

No member of the purported plaintiff class has submitted proof or demonstrated a reasonable basis for finding that Cramer will not fairly and adequately protect the interests of the class, or that the firm is subject to unique defenses which render it incapable of adequately representing the class. Thus, the section 21D(a)(3)(B)(iii) presumption stands, and Cramer Rosenthal is hereby appointed lead plaintiff in this action.

### C. Selection of Lead Counsel under the PSLRA and in this Case

■ The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." Exchange Act § 21D(a)(3)(B)(v). Court approval of lead counsel is not governed by the same statutory standards as the selection of lead plaintiff, but is a matter within the court's discretion. *See In re Milestone Scientific Sec. Litig.*, 187 F.R.D. 165, 175–76 (D.N.J. 1999). "Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class." *Id.* at 176.

■ Cramer has selected and retained Gold Bennett Cera & Sidener LLP ("GBC & S") to represent the class. Notice of Motion and Motion to Appoint Cramer Rosenthall McGlynn, LLC as Lead Plaintiff, to Approve its Selection of Counsel as Lead Counsel and to Consolidate All Related Actions at 2 n. 1. We are satisfied that GBC & S would be an effective lead counsel in this action. The firm's primary practice area is complex business litigation, including securities litigation, antitrust and trade regulation, consumer class actions, employment discrimination, bankruptcy litigation, and corporate litigation. *See* Firm Resume, Ex. C to Declaration of Paul F. Bennett in Support of Motion to Appoint Mesirow Asset Management as Lead Plaintiff, to Approve its Selection of Counsel as Lead Counsel, and to Consolidate All Related Actions.[5] Mr. Cera, who has thus far appeared on behalf of GBC & S, has previously been involved in several complex class actions, and has received praise from the Chief Judge of the United States District Court for the Northern District of California in connection with his representation of a class of approximately 3,000 investors in that court. *See id.* GBC & S has been involved in the prosecution of securities class actions for over twenty years. *See* Notice of Motion and Motion to Appoint Cramer Rosenthal,

---

**5.** GBC & S currently serves as counsel for both Cramer Rosenthal and Mesirow. The firm resume was submitted as an exhibit to the Mesirow motion.

McGlynn, LLC as Lead Plaintiff, to Approve its Selection of Counsel as Lead Counsel and to Consolidate All Related Actions at 12. For these reasons, we find that GBC & S possesses the requisite experience and expertise to serve as lead counsel in this action, and therefore approve Cramer's selection of lead counsel.